PHYLLIS JOHNSON vs. FREDERICK J. WITKOWSKI,
individually and as trustee, & others.[1]

No. 88-P-1168.

Worcester. December 12, 1989. - June 19, 1991.

Present: BROWN, DREBEN, & JACOBS, JJ.

*Fiduciary. Trust*, Breach of trust, Trustee's authority. *Corporation*, Close
corporation, Officers and agents, Stockholder. *Guaranty. Jurisdiction*,
Nonresident, Long-arm statute.

Discussion of the fiduciary duties owed by corporate directors and trustees.
[705-706]

Directors of a closely held corporation lacked express or inherent authority
to bind the corporation to a guaranty of the indebtedness of another
corporation in which they held a substantial interest. [706-709]

Directors of a closely held corporation, as matter of law, violated their
fiduciary duty by committing the corporation to a guaranty of a loan to
be used by its wholly-owned subsidiary in acquiring the assets of a fi-
nancially insecure corporation in which the directors had a substantial
interest, as part of a transaction that would have the effect of discharg-
ing the directors from their personal guaranties of that corporation's
indebtedness. [709]

In an action challenging the conduct of two directors of a closely held
corporation in a transaction wherein the corporation's subsidiary ac-
quired the assets of a financially insecure corporation in which the di-
rectors had a substantial interest, the directors had the burden of show-
ing that they did not cause the subsidiary to pay more for the assets
than their fair market value. [709-711]

In an action challenging the conduct of two directors of a closely held
corporation, once improper self-dealing by the directors had been
shown, their actions were to receive strict scrutiny, rather than be
judged by resort to the business judgment rule. [711-712]

The Massachusetts courts had jurisdiction to decide the merits of a civil
action against a Connecticut corporation and an individual resident of
that State under both the statutory test of the Massachusetts long-arm
statute, G. L. c. 223A, § 3(*a*), and the Federal constitutional test ar-

---

[1]James M. Brown and Johnson Corrugated Products Corporation. As is
the case with Witkowski, Brown is named defendant individually and as
trustee of the Melvin G. Johnson Trust. Whenever the term "defendants"
is used, the term refers to the two individual defendants Brown and
Witkowski.

ticulated in *International Shoe Co.* v. *Washington*, 326 U.S. 310, 320 (1945). [712-714]

A defendant in a civil action could not successfully argue for the first time on appeal that the service of process upon him was defective. [714]

CIVIL ACTION commenced in the Superior Court Department on March 14, 1985.

The case was heard by *Mel L. Greenberg*, J.

*James C. Donnelly, Jr.* (*Joseph M. Hamilton* with him) for the plaintiff.

*Robert J. Baum* (*Edward R. Wiest* with him) for the defendants.

BROWN, J. The situation presented by this case brings to mind the scenes in old movies in which a ship is sinking and someone is heard to yell, "Man the lifeboats, women and children first!" In those movies, the captain usually went down with the ship.

1. *Facts.* We first relate the mostly undisputed facts taken primarily from the judge's findings, a rather lengthy rendition necessary to set the scene.

Johnson Corrugated Products Corporation (Johnson Corrugated), a manufacturer of corrugated paper and boxes, was established by the late Melvin G. Johnson, a Massachusetts resident, in 1962, with its principal place of business in Thompson, Connecticut, just across the southern border of Worcester County. At all times relevant to this action, the corporation was managed by the defendants, Frederick J. Witkowski and James M. Brown. Witkowski has served as the chief executive officer and has been in charge of production since Melvin's death in 1974. Brown came to the company in 1979 after serving as a banking and financial adviser to the company for many years. The defendants are also two of the three directors of the corporation, and they each hold ten percent of its stock as a result of transfers from Melvin prior to his death.

Johnson Corrugated has always been a closely held corporation. At the time of his death, Melvin owned about a seventy percent interest in the company. After Melvin's death,

his share of the stock of the company was transferred from his estate to an inter vivos trust which he had created in Massachusetts in 1968. At that time, one of the then share-holders allowed his stock to be redeemed so that the trust ultimately received approximately an eighty percent interest in the corporation.

According to the terms of the trust, at Melvin's death the trust, which would then contain the bulk of his estate, would be divided into two funds ("Trust A" and "Trust B"), each holding fifty percent of the assets of the estate, including the majority interest in the company. The defendants are the trustees of the trust.[2] Melvin's widow, the plaintiff Phyllis Johnson, is paid all of the income from Trust A during her lifetime, with a general power to appoint the principal by her will. The trustees are given discretion to distribute income attributable to Trust B if required for her support.

The trust gives the trustees wide power and discretion to manage the corporation and the trusts.[3] The trustees are au-thorized to use the stock to continue the business of Johnson Corrugated "in such manner and for such time as the Trust-ees may deem advisable" and are specifically granted "all the powers which I [Melvin] would have if personally present and acting." In the trustees' discretion, "the kind of business in which the corporation is engaged may be changed and the scope and nature of its activities enlarged or diminished or. . . dissolved and its assets liquidated." By virtue of their power to vote the shares of the trust and their positions as

---

[2] Witkowski and Brown were the only trustees at the time of the events giving rise to this litigation. The defendants have never accepted compen-sation for their services as trustees, despite a provision allowing such pay-ment in the trust instrument.

[3] The trust instrument provides that Melvin "desire[d]" that the trustees "continue to hold" the Johnson Corrugated stock, and it indicated that this directive was "not intended to prohibit the sale of any or all such stock should the Trustees deem that course advisable, but as I believe that it will be beneficial to my estate to retain this stock, I authorize its retention at the risk of my estate."

directors and officers, the defendants effectively control the corporation.[4]

After Melvin's death, the plaintiff was appointed to the board of directors, but, in late 1982, she requested that her brother, Robert Langway, be elected to replace her as a member of the board. She then was given the title of "honorary director" and was invited to attend all of the directors' meetings. She also continued to receive a director's fee.

We come now to the centerpiece of this litigation: United Sheet Services, Inc. (USSI). That corporation was formed in October of 1982 with three shareholders, the defendants and Richard Braverman, the president of R&R Corrugated, a customer and competitor of Johnson Corrugated. The idea was that, unlike Johnson Corrugated, USSI would not produce finished products but would manufacture only corrugated sheets (which would be sold to "finishing plants," including R&R Corrugated, which would make their own boxes or other products from the sheets). Projections made by a public accounting firm with extensive experience in the industry showed that USSI would be an extremely profitable venture. USSI arranged for initial financing of the venture from Connecticut Bank & Trust Company in the amount of $150,000, which was personally guaranteed by the defendants, Braverman, and their wives, and USSI purchased a corrugated sheet plant and associated equipment at an existing facility in New Haven, Connecticut. USSI commenced operation on November 1, 1982.

At some point, Witkowski and Brown were advised that they could not invest in USSI without including Johnson Corrugated.[5] On November 18, 1982, Brown made a presen-

---

[4]In the event the trustees should decide to liquidate or sell the stock of Johnson Corrugated, so that the trust would cease to hold a majority interest in the company, then, according to the trust instrument, "a third corporate trustee, which shall be preferably a commercial bank having a full time trust department, shall be appointed by the then Trustees. . . ."

[5]The parties have not raised any issue of corporate opportunity — see *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187 (1948); *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 378 (1951); *Energy Resources Corp.* v. *Porter*, 14 Mass. App. Ct. 296, 299-302 (1982) — but, as shall be read-

tation to the directors of Johnson Corrugated (i.e., himself, Witkowski, and Langway). The minutes of the meeting show that Brown related the accountant's favorable projections and explained that the defendants had always intended to include Johnson Corrugated as a stockholder of USSI but "did not want to subject it to risks involved in start up operations." Brown went on to elaborate that the defendants thought they could bring Johnson Corrugated in "when all the necessary financing had been consummated" and that Johnson Corrugated's equity position "must always be kept on a low key basis; this way [it] can participate in the venture at a minimum risk basis." There was also reference to the $150,000 in financing USSI had already received from Connecticut Bank & Trust and talk that the financing scheme contemplated the inclusion of a Small Business Administration (SBA) loan of $250,000, which would also require personal guaranties. Johnson Corrugated could purchase a one-quarter interest in USSI for $16,667. Langway recommended the proposal to the plaintiff, and the board unanimously voted to purchase the one-quarter interest.

A potential problem appeared when the SBA insisted on a guaranty by Johnson Corrugated. Counseled by their attorney, the defendants, in their capacities as trustees, refused to have the company sign a guaranty. Any snag at this point was avoided, however, when the Connecticut National Bank offered the requested loan at commercial rates without any SBA involvement, based solely on the guaranties of the original three investors and the defendants' spouses. In January, 1983, Johnson Corrugated became a stockholder of USSI.

The venture did not perform as expected. USSI exhausted all available financing and was forced to increase its borrowing from Connecticut National Bank by an additional $100,000. The bank, however, was not willing to make the loan without a guaranty from Johnson Corrugated. On March 31, 1983, USSI signed a promissory note for

---

ily apparent, it is at this point that the defendants began to embark on unsafe waters.

$350,000, which consolidated the original loan for $250,000 and the new loan. Attached to the promissory note was an "unconditional" and unlimited ("any and all liabilities . . . now existing or hereafter arising") guaranty of Johnson Corrugated, signed by Witkowski as president, of all USSI's debts to the bank.[6] There was never board approval of an unlimited guaranty.[7] A separate guarantee was also made at the same time by the defendants, their wives, and Braverman.

USSI, meanwhile, continued to do poorly and had to borrow additional money, and by September 30, 1983, borrowings from Connecticut National Bank had increased to $640,000 (this included a loan of $100,000 made on May 15, 1983, only two weeks after the prior loan for the same amount). On November 23, 1983, the defendants purported to buy Johnson Corrugated's stock in USSI (they executed a no interest "Promise to Pay" to Johnson Corrugated for the stock, upon which payment was not due for four years[8]), but Johnson Corrugated remained on the hook to the bank by its guaranty. At the close of fiscal year 1984, USSI had accumulated a net loss of $930,578.

With USSI apparently on the brink of bankruptcy, the defendants devised a plan whereby a "bulk sale" of the assets of USSI would be made to a newly formed subsidiary of Johnson Corrugated — Pacific Paperboard Corp. (PPB) — in exchange for an assumption by PPB of the secured obligations of USSI, including the bank debt for which the defendants were personally liable. Under the plan, Johnson Corrugated would not become liable to USSI's unsecured creditors (a debt amounting to approximately $900,000, mostly to pa-

---

[6]Witkowski had also signed a similar document making Johnson Corrugated an unlimited and unconditional guarantor of USSI's debts on March 21, 1983. See also note 13, *infra*, and accompanying text.

[7]Nor did the judge make any finding that Langway authorized or knew about the unlimited guaranty.

[8]The decision of the trial judge was issued prior to the time when the payment was due, and there is no issue before us regarding any amount owed by the defendants to Johnson Corrugated under their "Promise to Pay."

per suppliers).[9] On November 20, 1984, Brown, as treasurer of both PPB and USSI, executed a purchase and sale agreement which provided that PPB would acquire certain assets of USSI for $665,956.53 (the amount of the debt to Connecticut National Bank), plus the assumption of USSI's secured equipment liability of $206,656.26, for a total of $872,612.79. An independent appraisal, which the judge found to be reasonable and unrebutted, estimated the total value of "the entire [USSI] operation" to be $550,000.

The defendants convened a meeting on December 18, 1984, at which Langway was removed as a director and the position of "honorary director" previously held by the plaintiff was abolished. A new director (Edward Hanlon, a longtime Johnson Corrugated employee then in charge of sales) was then elected.

The bulk sale from USSI to PPB was closed on December 31, 1984. Connecticut National Bank financed the purchase of USSI's assets by PPB. Again, as part of the financing, the bank required Johnson Corrugated, as owner of all of the stock of PPB, to give an unlimited and unconditional guaranty of PPB's loans; the defendants, however, were not required to give guaranties.[10]

Although more successful than USSI, its predecessor, PPB was also a losing venture, and it was liquidated in June of 1987.

2. *Relief sought and disposition below.* Essentially, the plaintiff complains that the defendants violated fiduciary duties when they committed the trust and its assets to a series of unauthorized and imprudent business decisions from

---

[9]Included in the list of USSI's unsecured creditors were Johnson Corrugated (owed $84,716.02) and the defendants (39,465.20 each). The Johnson Corrugated debt was "reclassified," according to Brown, as an "investment" by Johnson Corrugated in PPB; the defendants apparently took the loss. Braverman's interest, according to the defendants' brief, had been "eliminat[ed]" earlier, although there is no indication in the record of precisely when or how this was accomplished.

[10]The judge concluded that *both* the defendants and the company agreed to guarantee PPB's debts so that the obligations to the bank were not called. The defendants admit that this conclusion was erroneous, however, and, in fact, only Johnson Corrugated's guaranty of the debt remained.

which they derived personal benefit but which caused sub-
stantial losses to the trust.[11] This is an appeal from a judg-
ment of the Superior Court which dismissed the complaint
based on findings that no violation of fiduciary duties oc-
curred. Although the judge did not specifically address every
action and transaction of the defendants questioned by the
plaintiff, he clearly concluded, viewing the circumstances in
their entirety, that the defendants did not act out of self-in-
terest and did not breach their fiduciary duties. The plaintiff
also appeals from the denial of her motions to amend the
judgments and for relief from judgment. By way of damages,
the plaintiff claims that as a result of the acquisition of PPB
and the additional expenses associated with its liquidation,
and due to certain other transactions, Johnson Corrugated
lost approximately $439,000, an amount which does not in-
clude losses which may have been incurred after January 31,
1987.

3. *Analysis.* We note initially that the difficulty arises here
because of the defendants' multiple roles. They were the
trustees of the trust and were also stockholders, directors,
and officers of a close corporation involved in transactions in
which they stood on both sides and in which they had a self-
interest. In each capacity, the defendants had fiduciary du-
ties. Wearing more than one hat — here, at least three —
requires a fiduciary to be very nimble as well as most pru-
dent. While the fiduciary may purport to wear one hat at a
particular moment, in truth, all hats are worn together at all
times.

a. *The duty of loyalty.* With the USSI venture, the de-
fendants were engaging in a business in addition to the busi-
ness of Johnson Corrugated, which prior to that time had

---

[11]The plaintiff also sued Johnson Corrugated "in the nature of a deriva-
tive action," although she technically owns no stock in the corporation. She
sought an accounting for the trust, and restitution of any profits the de-
fendants may have received from acts of self-dealing or imprudence as
trustees of the trust and as officers and directors of the corporation. During
the trial and in several posttrial motions, she also sought the defendants'
removal as trustees and the appointment of new independent trustees to
administer the trust.

been their primary source of income. USSI was a business in which the defendants expended substantial energy, held half the stock, and for which, by virtue of their personal guaranties, were taking significant monetary risks if the new venture was not successful. There can be no doubt that, with USSI, another level of complexity was added to the equation of the defendants' duties to the trust and to the corporation. What was good for USSI was not necessarily good for Johnson Corrugated.

We insert a few general observations. Directors' fiduciary duties require that they be loyal to the corporation and not promote their own interests in a manner injurious to the corporation.[12] *Baker* v. *Allen*, 292 Mass. 169, 172 (1935). *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 410 (1937). *Donahue* v. *Rodd Electrotype Co. of New England*, 367 Mass. 578, 589, 593 (1975) (duty of care by one stockholder to another in close corporation is one of "utmost good faith and loyalty"). There is a similar duty of loyalty imposed on trustees. *Ball* v. *Hopkins*, 268 Mass. 260, 266 (1929). Trustees may not put themselves in a position where their interests are in conflict with the interests of the trust. *Comstock* v. *Bowles*, 295 Mass. 250, 258 (1936). See also 3 Scott, Trusts § 193.2, at 155 (Fratcher 4th ed. 1988) ("The trustee will be held accountable by the court if in the exercise of his power of control over the corporation he acts for his own interest rather than for the interest of the benefi-

---

[12]We point to Chief Judge Cardozo's lofty language: "Joint venturers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a higher level than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." *Meinhard* v. *Salmon*, 249 N.Y. 458, 464 (1928).

ciaries"). A trustee's first duty is the protection of the trust estate. No self-interest can be allowed to conflict with this responsibility. The burden of proving good faith and fairness is on the trustee, as is the burden to show that any questioned transaction was advantageous to the beneficiaries. See *Ball* v. *Hopkins*, 268 Mass. at 266; *Burlingham* v. *Worcester*, 351 Mass. 198, 203 (1966). The rule that a fiduciary may not derive personal advantage at the expense of the trust, nor put himself in a position antagonistic to the beneficiaries of the trust, will be strictly enforced. *Anderson* v. *Bean*, 272 Mass. 432, 448 (1930).

Obviously, as in this case, fiduciary duties as directors and officers and as trustees can be interrelated. "Where a trustee of shares of a corporation is also an officer or director of the corporation, and by a breach of his duty to the corporation as such officer or director he causes a loss to the corporation, thus causing to depreciate in value the shares that he holds in trust, the question arises whether he is liable to the beneficiaries of the trust for the depreciation of the shares. If the trustee makes good to the corporation the loss caused to it, there is no impairment in the value of the shares and no liability to the beneficiaries of the trust." 3 Scott, Trusts § 193, at 144. In the absence of an allegation of a breach of fiduciary duty in their capacities as trustees only, we can therefore focus on the defendants' actions in their capacity as officers and directors of Johnson Corrugated.

b. *Johnson Corrugated as guarantor.* The unlimited guaranty given by Witkowski on behalf of Johnson Corrugated for the USSI venture was made without authority; it also benefited the defendants while providing comparatively little benefit to the corporation. At the November 18, 1982, meeting of the board at which the decision was made that Johnson Corrugated would purchase one-fourth of the stock of USSI, there was also, according to the defendants, an agreement by Johnson Corrugated that, "if necessary," it would

guarantee the debts of USSI up to $500,000.[13] When the SBA indicated that it would not provide financing without a guaranty from Johnson Corrugated, counsel for the defendants, on December 17, 1982, informed the SBA that Johnson Corrugated could not guarantee the obligations of USSI or the defendants to the SBA.[14] At trial and in their brief on

---

[13]Langway denied that he was ever informed or voted to approve any guaranty. The judge found that the defendants were authorized to have Johnson Corrugated guarantee up to $500,000 of USSI's debt.

[14]We set forth in full the text of the letter:

"I represent James M. Brown and Frederick J. Witkowski, shareholders of United Sheet Services, Inc. of New Haven, which seeks the assistance of the Small Business Administration to help finance its purchase of some equipment needed for a proposed business venture. In connection with United Sheet's loan application, you have a[sk]ed that Johnson Corrugated Products Corporation, a Connecticut corporation of which Frederick J. Witkowski is director and president and James M. Brown is a director, guarantee the loan repayments obligations of United Sheet Services, Inc. and Messrs. Brown and Witkowski.

"I am writing to advise you that Mr. Brown and Mr. Witkowski presently serve as Trustees of a certain inter-vivos agreement of trust established by Melvin G. Johnson (the founder of Johnson Corrugated, now deceased) on April 1, 1968. The Johnson Trust currently owns 80% of the outstanding capital stock of Johnson Corrugated Products Corporation. The other outstanding shares of Johnson Corrugated are owned equally by Brown and Witkowski (approximately 10% each).

"In order for Johnson Corrugated Products Corporation to guarantee the obligations of Messrs. Brown and Witkowski and United Sheet Services, Inc. to the SBA, a vote of at least a majority of the shareholders (and quite possibly a two-thirds vote) would be required. Obviously, such a vote could not be taken without the affirmative action of the Trustees of the Johnson Trust who own nearly 80% of the company's stock.

"It is my opinion that the Trustees may not vote to cause Johnson Corrugated to guarantee the SBA loan made to United Sheet Services, a company in which Messrs. Brown and Witkowski are shareholders, without breaching their fiduciary duty to the beneficiaries of the trust. The stock in Johnson Corrugated represents the largest single asset of the Johnson Trust. If the Trustees voted to authorize the company's loan guarantee and if the company were later called upon to make repayment to the SBA, the value of the stock in the trust would be diminished. Thus, the Johnson Trust derives no benefit from the guarantee by Johnson Corrugated while at the same time having the entire risk of the guarantee. In my opinion it would be imprudent for the Trustees to take such action.

"Furthermore, as you are probably aware, a trustee is prevented from using the trust for his own benefit or personal enrichment. I believe the Trustees of the Johnson Trust would be in breach of a fiduciary duty to avoid such self-dealing if they caused the trust to take action from which

appeal the defendants have asserted that "Johnson Corrugated could not guarantee SBA loans to USSI where Johnson Corrugated would derive no benefit. The letter was premised on Johnson Corrugated not being a USSI shareholder. . . . Johnson Corrugated's guaranty was appropriate as and when it became a shareholder."[15] Even assuming the defendants' characterization of the letter is accurate,[16] there was never approval by the Johnson Corrugated board for the unlimited guaranty which Witkowski signed on behalf of Johnson Corrugated in March of 1983.[17] The defendants had no authority to bind the corporation to such a guaranty. There was no evidence of express authority by the board to guarantee any amount over $500,000, and the inherent authority of corporate officers in Massachusetts is extremely limited. See *Kelly* v. *Citizens Fin. Co.*, 306 Mass. 531, 532-533 (1940); *Lucey* v. *Hero Intl. Corp.*, 361 Mass. 569, 572-573 (1972). A corporate president's inherent power to act on behalf of a corporation is not increased because he holds a majority of the voting stock in the corporation. *Stoneman* v. *Fox Film Corp.*, 295 Mass. 419, 425 (1936). Nor as officers did the defendants have the implied authority to execute such an agreement. See *Sherman* v. *Fitch*, 98 Mass. 59, 64 (1867); *M. McDonough Corp.* v. *Connolly*, 313 Mass. 62, 65-67

they ultimately derive personal benefit. Such action would, I believe, subject them to personal liability and surcharge by the beneficiaries of the Johnson Trust."

"For these reasons I believe Messrs. Brown and Witkowski may not cause Johnson Corrugated Products Corporation to guarantee United Sheet's and their personal obligation to the SBA."

[15]The judge found that "the defendants, in their capacities as trustees, refused [to give a guaranty on behalf of Johnson Corrugated] as the remaining twenty-five . . . percent interest in USSI had not been transferred to the company. Obviously, the defendants were attempting to minimize the risk to the company."

[16]As noted, Johnson Corrugated had formally accepted the offer of the quarter interest in USSI and also agreed to a $500,000 guaranty in November, 1982, a month before the letter to the SBA was written; Johnson Corrugated became a shareholder of USSI in January, 1983. There was no mention of the prospective share of Johnson Corrugated in the letter to the SBA.

[17]See notes 6 and 7, *supra*, and accompanying text.

(1943). Further, there can be no doubt that the defendants who had executed personal guaranties benefited from the unlimited guaranty because it kept USSI from failing and going bankrupt.

There are also issues of fiduciary duties in the PPB guaranty. Johnson Corrugated gave a guaranty of the bank loan used to finance the acquisition of the USSI assets by PPB, and in the process all prior guaranties (most notably, those of the defendants) were cancelled. The defendants clearly derived personal benefit from the PPB acquisition when it paid off debts of an insolvent company for which they were personally liable as guarantors. Johnson Corrugated was required to guarantee the new acquisition debt of $665,956, but the defendants were not.

The defendants' argument that, since their original personal liability was contingent and the loans were never called by the bank, and since their personal beneficial ownership in USSI was greatly reduced[18] and their unsecured loans to USSI were wiped out by the PPB deal, they did not receive any benefit, is without merit. They were off the hook on the personal guaranties. The bank did not need to act on the defendants' guaranties because it was given a better substitute guaranty by Johnson Corrugated. Further, that the defendants lost the money they put into the USSI venture does not negate the benefit they received by having their guaranties canceled.

The bailout of the defendants at the time of the asset sale to PPB was, as matter of law, a breach of the defendants' fiduciary duties. They placed their own interests ahead of the interests of the trust and the corporation. To return to the analogies of the first paragraph of this opinion, the defendants' jumping ship at the time of the purchase was in their self-interest, at the expense of the trust and the corporation.

c. *Purchases and sales between directors and their corporation.* "Where the director's duty of loyalty to the corpora-

---

[18]That is, the defendants' 100% interest in USSI was reduced to a twenty percent interest in PPB by way of their ownership of twenty percent of the stock of Johnson Corrugated.

tion is in conflict with his self-interest the court will vigorously scrutinize the situation." *American Discount Corp.* v. *Kaitz*, 348 Mass. 706, 711 (1965). When corporate fiduciaries are on both sides of transactions and the fairness of such transactions is challenged, "the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration." *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. at 411, quoting from *Geddes* v. *Anaconda Mining Co.*, 254 U.S. 590, 599 (1930). See also *Winchell* v. *Plywood Corp.*, 324 Mass. 171, 177-178 (1949); *Dynan* v. *Fritz*, 400 Mass. 230, 241 (1987). Thus, the purchase of all of Johnson Corrugated's USSI stock by the defendants together with the (almost immediately following) sale of USSI's assets to PPB, Johnson Corrugated's new, wholly owned subsidiary, are subject to careful scrutiny. Directors and officers who choose to run the risk of playing on both sides of the fence with their corporation are — or should be — advised to conduct their business as openly as possible, to avoid even the appearance of impropriety, and to structure the deal so that it resembles as much as possible an arm's length transaction.

There was evidence that the defendants kept information from Langway and committed the corporation to actions without informing Langway and without obtaining his consent. The judge made no specific findings on this point, but Witkowski himself testified that he never told Langway or the plaintiff about the PPB plan to acquire the assets of USSI. Brown conceded that there was no meeting with Langway to discuss the acquisition of the USSI assets, and Langway testified that he had no knowledge of any plan relating to the sale of USSI's assets. These uncontroverted statements indicate that Langway simply was not kept informed, despite the fact that he was a director of the corporation.[19]

---

[19]Even if the judge did not believe Langway's testimony at all, he could not ignore the defendants' testimony as to how they failed to keep Langway informed.

The plaintiff claims that the defendants caused PPB to acquire USSI's assets for an amount far in excess of their fair market value, noting that the only independent appraisal of USSI's operation estimated the total value of the "entire operation" at $550,000, while the defendants caused PPB to assume debt $332,612 in excess of the value of the operation. She also claims that as a result of the bulk sale Johnson Corrugated lost an account receivable of $84,716, and voluntarily assumed liability for unsecured accounts payable totalling $76,788.[20] From this, the plaintiff concludes that PPB paid approximately $450,000 more for USSI than the "entire operation" was worth.

The defendants contend that any claim of overpayment rests on the construction to be given the appraisal of USSI's assets of $550,000, which the court accepted as reasonable and unrebutted.[21] The defendants claim that the appraisal did not include cash, accounts receivable and inventory in an amount of over $650,000, which were transferred to PPB in the bulk sale.

These disputes will have to be sorted out on remand.

d. *Business judgment.* The business judgment rule[22] does not apply if the plaintiff can show self-dealing. *Sagalyn* v. *Meekins, Packard & Wheat Inc.,* 290 Mass. 434, 439

---

[20]See note 9, *supra.*

[21]The judge excluded a second version of the appraisal, which attributed a value of $225,000 to USSI's equipment. It was error to exclude the second document, for the reason, if no other, that it was relevant for impeachment purposes. The defendants rather weakly claim that the document was not properly authenticated. However, the second document was introduced in the same manner as the first and Brown specifically stated that the document was the "value given to the equipment by [the appraiser] Mr. Yaffee." See Proposed Mass. R. Evid. 901(a) and 901(b)(4). The second copy was identical to the first, except for the statement as to the value of the equipment. It was also relevant to show that the first copy was incomplete. As a result, the judge ignored relevant evidence as to the value of the USSI equipment, the amount of loss Johnson Corrugated sustained as a result of the "bulk sale" of the USSI business, and the defendants' breach of their fiduciary duties.

[22]"It is no part of the judicial function to substitute [the court's] business view for that of those vested by law with the control of corporate affairs." *Spiegel* v. *Beacon Participations, Inc.,* 297 Mass. at 433. See also in this regard G. L. c. 156B, § 65.

(1935). See *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. at 433. Thus, where directors stand on both sides of a transaction or have a personal financial interest in a transaction, their actions are not judged solely by resort to the business judgment rule. The trial judge recognized these principles, but he found the facts of this case "fail to show breach of fiduciary duty on the part of the defendants either as directors or trustees." As is apparent from our preceding discussion, we disagree with the judge's conclusion that there was no violation of fiduciary duties. See *Simon* v. *Weymouth Agric. & Indus. Soc.*, 389 Mass. 146, 151 (1983). The purchases and sales between the fiduciaries and their corporation were enough to invoke "vigorous scrutiny"[23] by a reviewing court. Subjecting the transactions that preceded the purchase and sale to strict scrutiny, we see business decisions (e.g., questionable guaranties and a bailout) that probably would not have been made by disinterested fiduciaries. Indeed, it appears that, beginning with the USSI venture, the defendants sought a series of related benefits to which they were not entitled by reason of their fiduciary positions.

As noted, the trust gives the trustees wide power and discretion to manage the corporation and the trust (and obviously contemplates the conflicts present in the identity of the directors, officers, trustees, and shareholders), but this does not condone the actions of the defendants in this case. We do not read any of the "exculpatory provisions" of the trust to excuse self-dealing.

3. *Procedural matters.* The defendants argue that the Superior Court never possessed jurisdiction to decide the merits of this case because the court did not have jurisdiction over Witkowski, a Connecticut resident, and Johnson Corrugated, a Connecticut corporation with its principal place of business in that State. The defendants also argue that Brown, who is a Massachusetts resident, was improperly served with the summons and complaint. They argue that the summons and complaint were served upon him by delivery to a place other

---

[23] *American Discount Corp.* v. *Kaitz*, 348 Mass. at 711. Compare *Houle* v. *Low*, 407 Mass. 810, 824 (1990).

than his "last and usual place of abode." Mass.R.Civ.P. 4(d)(1), 365 Mass. 734 (1974).

The motion judge was correct in concluding the defendants were "transacting business" in Massachusetts within the meaning of G. L. c. 223A, § 3(a), the so-called "long-arm" statute. As used in the statute the term "transacting business" does not require purely commercial activity but is used to embrace any purposeful acts performed in Massachusetts, whether personal, private, or commercial. *Ross* v. *Ross*, 371 Mass. 439, 441 (1976). The transacting business clause has been construed broadly and, if a cause of action arises from a contract, the signing of the contract in Massachusetts is literally transacting business within § 3(a). *Carlson Corp.* v. *University of Vt.*, 380 Mass. 102, 105 (1980). Witkowski's signing of a document amending the trust, although not technically a contract, was a purposeful and meaningful business transaction creating an ongoing fiduciary relationship. See *Chase* v. *Chase*, 2 Allen 101, 104-105 (1861). That relationship is the subject of this suit. The motion judge, in ruling upon the defendants' motion to dismiss, concluded that: "[Witkowski's] involvement with the trust began when he signed a document in Massachusetts, which amended the trust by appointing him as one of its trustees. The signing of the trust amendment was an essential and critical business transaction creating an ongoing fiduciary relationship between the parties, and, as a result, it comes within the statutory provision of G. L. c. 223A, § 3(a)." There is a rational nexus between the cause of action and the transaction of business in Massachusetts. This satisfies the literal requirements of the statute. Cf. *Kleinerman* v. *Morse*, 26 Mass. App. Ct. 819, 822-823 (1989).

It is also likely that the facts of this case bring it within § 3(c) of c. 223A as well. *Burtner* v. *Burnham*, 13 Mass. App. Ct. 158, 163 (1982). Although the plaintiff's complaint did not explicitly use the words "tortious injury," she alleged that Witkowski made numerous false statements to the plaintiff and Langway within the Commonwealth in the form of

financial statements and oral communications. See *Kleinerman* v. *Morse*, 26 Mass. App. Ct. at 823-824.

In regard to the constitutional requirements, the touchstone remains whether the defendant purposefully established "minimum contacts" in the forum State and whether specific jurisdiction over the defendant comports with "fair play and substantial justice." *International Shoe Co.* v. *Washington*, 326 U.S. 310, 320 (1945). *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 474, 476 (1985). *Heins* v. *Wilhelm Loh Wetzlar Optical Mach. GMBH & Co.*, 26 Mass. App. Ct. 14, 21-27 (1988), and cases cited therein. Here, the activity conducted by the defendants, including the corporation, in regard to the trust gave them sufficient "warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Shaffer* v. *Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring). The trust was formed in Massachusetts and was funded by the estate of a Massachusetts resident. Most of the beneficiaries are Massachusetts residents. Witkowski signed the trust in Massachusetts and has continued to manage and administer the trust while maintaining numerous contacts with the plaintiff in Massachusetts. See *Hanson* v. *Denckla*, 357 U.S. 235, 253 (1958). Consequently, the courts of Massachusetts could constitutionally exercise jurisdiction over the defendant Witkowski. *Heins* v. *Wilhelm Loh Wetzlar Optical Machinery GMBH & Co.*, 26 Mass. App. Ct. at 27.

Brown, as a Massachusetts resident, is subject to the jurisdiction of the court. He claims, however, that he was not properly served with the summons and complaint pursuant to Mass.R.Civ.P. 4. The argument is of no avail. The sheriff's return is prima facie evidence that the defendant was served. *Carleton* v. *Bickford*, 13 Gray 591, 596 (1859). Moreover, the defendant did not move to have the complaint dismissed, or the service quashed, nor did he put forward any evidence at trial that he was improperly served.

4. *Conclusion.* From our conclusion that the plaintiff has shown lapses on the part of the defendants in the performance of their fiduciary duties, it does not necessarily follow

that an award of damages is appropriate. We agree with the defendants that, by the way the plaintiff has framed the issues, the only real dispute between the parties is whether it was prudent for Johnson Corrugated through PPB to purchase the USSI assets (see part 3 of this opinion). On remand, then, the judge does not need to unravel the whole sweater but only the last row or two: Johnson Corrugated is entitled to be reimbursed by the defendants to the extent, if any, that the consideration paid by it for the USSI assets was inherently unfair and more than they were worth. See *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. at 411; *Winchell* v. *Plywood Corp.*, 324 Mass. at 177.

There also remains the issue of the continuation of the defendants in their role as trustees of the trust. See note 11, *supra*. We think that that issue may depend on the present condition of the corporation and the desire of other trust beneficiaries and hence is better left for exploration by the judge on remand.

The judgment is reversed, and the matter is remanded to the Superior Court for the entry of a new judgment for the plaintiff and for further proceedings to include a hearing on whether the defendants should continue in their capacity as trustees and an assessment of such damages as may be determined in a manner consistent with this opinion.

*So ordered.*