KEVIN O'BRIEN vs. JOHN H. PEARSON, JR., & another.[1]

No. 05-P-413.

Middlesex. January 6, 2006. - August 3, 2006.

Present: GREENBERG, COWIN, & MILLS, JJ.

Further appellate review granted, 447 Mass. 1111 (2006).

*Corporation,* Close corporation, Sale of assets, Stockholder.

In a civil action, the evidence was insufficient to warrant a finding that the defendants, majority stockholders in a closely held corporation, breached their fiduciary duty to the plaintiff minority stockholder by selling the corporation's assets at a substantial profit, where the plaintiff did not establish that the defendants had committed themselves to acquiring a certain subdivision for development when the corporation was formed, and where the defendants' violation of G. L. c. 156B, § 75, in selling the corporate assets without a two-thirds vote of the stockholders did not equate to a breach of fiduciary duty, given that there was no wrongful diversion of corporate assets or other fraud or preference at the expense of the minority stockholder. [34-41]

CIVIL ACTION commenced in the Superior Court Department on February 2, 1999.

The case was tried before *Raymond J. Brassard,* J.

*Jeffrey S. King* (*Wendy A. Berliner* with him) for the defendants.

*Edward Notis-McConarty* (*Joseph L. Bierwirth, Jr.,* with him) for the plaintiff.

COWIN, J. The plaintiff, Kevin O'Brien, owner of forty-eight percent of the stock of Summer Hill Estates, Inc., a closely held corporation (Summer Hill or the corporation), brought this action for breach of fiduciary duty[2] against the defendants, John

---

[1]Margaret Palm.

[2]The plaintiff initially sought injunctive relief, a declaratory judgment, and damages, his original objective being to set aside the transaction in question. When that proved impossible, he limited his case at trial to one for damages for breach of fiduciary duty.

H. Pearson, Jr., and Margaret Palm,[3] owners of the remaining stock (twenty-six percent each). A judge of the Superior Court denied the defendants' motion for a directed verdict and submitted the case to a jury on special questions. In response, the jury found that the defendants had breached their fiduciary duty to the plaintiff and that the plaintiff had incurred damages as a result of such breach in the amount of $900,000. The judge denied the defendants' ensuing motion for judgment notwithstanding the verdict or for a new trial, although he acknowledged that the case was a close one.

The defendants filed a timely notice of appeal. They argue essentially that the evidence was insufficient to warrant a finding that they breached fiduciary responsibilities in light of the parties' understandings and the circumstances regarding the project for which the corporation was formed. They assert also that the judge erred in admitting certain expert testimony and that the damages awarded by the jury were speculative. We agree with the defendants that, on this record, their decision to sell the corporation's assets at a profit of $300,000 (a profit equal to 300 percent of the cash invested in the enterprise) could not be found to be a breach of fiduciary duty to the minority stockholder, and we accordingly reverse the judgment. Our determination regarding the sufficiency of the evidence regarding liability makes it unnecessary to consider the other appellate issues.

1. *Facts.* Viewing the record in the light most favorable to the plaintiff, the jury could have found the following. The plaintiff, an experienced builder of single-family homes and residential subdivisions, learned of a subdivision of approximately sixty undeveloped lots on ninety-five acres in Dracut. The property was owned by Twin Hills Development Corporation (Twin Hills), the principals of which were Vincent and Domenic Shelzi. Although Twin Hills had obtained local approval to commence construction on the lots, the company's financial difficulties precluded such a venture. The corporation

---

[3]The actual party in interest is Nels Palm, Margaret Palm's husband, although it was Margaret Palm who was elected a director of the corporation. The parties agree that, for purposes of this case, Nels and Margaret Palm are interchangeable.

was in bankruptcy (Chapter 11); among other liabilities, Twin Hills owed $700,000 plus interest to Wakefield Savings Bank on a promissory note personally guaranteed by each of the Shelzis, and the promissory note was secured by a mortgage on nine of the sixty subdivision lots.

The plaintiff investigated the situation and, in 1996, contacted defendant John H. Pearson, Jr., to discuss acquisition of the subdivision with financing by Pearson.[4] After further inquiries by the plaintiff, Pearson, and Nels Palm, Pearson's business associate, the three decided to attempt to purchase the promissory note and mortgage held by Wakefield Savings Bank as a means of obtaining leverage with which to persuade the Shelzis to part with the property. While the note was worth in the vicinity of $1,000,000 by 1998 because of accrued but unpaid interest, it was doubtful that such an amount could be collected. A bankruptcy judge had in fact already valued the security for the note at $432,000 for purposes of the Chapter 11 proceeding, and a consultant retained by the defendants advised that the note could probably be purchased from Wakefield Savings Bank for approximately $100,000.

A negotiation to this end was successful, and the note and mortgage were obtained from the bank for $100,000 provided by Palm. The plaintiff, Pearson, and Palm created the corporation (Summer Hill), and the note and mortgage became the corporation's assets. While the mortgage covered only nine of the subdivision's sixty lots, the parties were optimistic that the location of the nine covered lots at the only entrance to the subdivision would give them an advantage in their efforts to acquire the property. They proceeded to enter into a letter agreement on March 16, 1998, spelling out their respective roles once the subdivision had been purchased. Thus, it was agreed that the plaintiff would run the project and be in charge of construction of the subdivision roads and the residences on the individual lots.[5] The defendants would provide financing, share

---

[4]The evidence is in conflict regarding which side brought the idea to the other. For purposes of this analysis, we adopt the version of the plaintiff.

[5]The plaintiff was eligible for increased compensation for the work he performed for the corporation, as well as his share of any profits due him as a stockholder.

with the plaintiff the selection of individual vendors, and decide how many homes to build. The agreement obligated the defendants to finance the project "as long as the project is economically feasible" and vested in them the power to "manage the business and financial affairs of the development." The agreement did not deal with how the property was to be acquired; nor did it make provision in any way for failure to obtain the property.

Following formation of the corporation and the parties' written agreement of March 16, 1998, the defendants, aided by their consultant (Joel Kahn), engaged in discussions with the Shelzis regarding possible acquisition of the property. The defendants requested that the plaintiff not participate, ostensibly so that, given the fact that he had a relationship of sorts with the Shelzi family, he could be brought in as the "good guy" if it would facilitate negotiations. Discussions continued through April, 1998, but the defendants did not at any time during that period make an actual offer to purchase. On May 6, 1998, Kahn wrote to the defendants that the Shelzis had informed him that they were prepared to pursue negotiations with another potential buyer. Kahn stated also that they (the Shelzis) would sell the property to Summer Hill in return for a release of the debt, a payment of $250,000, and an agreement that would permit their father to remain in his house on the property (or an equivalent). Kahn reported in addition that he had discouraged any expectation that Summer Hill would pay that kind of money and that he had discussed with them the possibility that, if another buyer did not materialize in four months, the property be conveyed to Summer Hill in lieu of foreclosure. At the same time, it was clear from Kahn's memorandum that the defendants were willing to consider as an alternative receiving a payment of some kind on the promissory note they had acquired from Wakefield Savings Bank and abandoning their plans to obtain the subdivision for future development.

The situation was altered considerably on May 18, 1998, when Twin Hills (the Shelzis' corporation) signed an offer to purchase agreement with Premier Homes, Inc., whereby Premier Homes agreed to acquire the subdivision for $947,000 (subject to certain conditions and contingencies). Despite this, discus-

sions continued between the defendants and the Shelzis, although now those discussions were focused in large part on what the Shelzis would pay to discharge the mortgage. The plaintiff steadfastly refused to accept a discounted payment of the promissory note, insisting that the original plan to use the note and mortgage as leverage with which to acquire the subdivision for development should be pursued. Despite the plaintiff's consistent opposition, the defendants went forward with the negotiations, and in August, 1998, entered into a letter of understanding with the Shelzis that (a) upon the sale of the subdivision to Premier Homes, Twin Hills would pay $400,000 for full satisfaction of the promissory note and discharge of the mortgage; or (b) if the sale to Premier Homes did not take place by a date certain, Twin Hills would convey the subdivision to Summer Hill in lieu of foreclosure.[6] The defendants offered the plaintiff an opportunity to purchase the note and mortgage for the same $400,000 offered by the Shelzis; the plaintiff was willing to do so, but conditioned the payment in ways that the defendants refused to accept.[7]

On January 22, 1999, Twin Hills sold the subdivision to Premier Homes, apparently for $640,000 (although the offer to purchase had identified a purchase price of $947,000). On January 27, 1999, at a special meeting of the stockholders of Summer Hill, the defendants sought approval of their proposal to cancel the promissory note and discharge the mortgage in return for a payment by Twin Hills of $400,000. The plaintiff objected, thereby denying the defendants the two-thirds vote necessary to effect a transfer of the note and mortgage (all of the assets of the corporation). See G. L. c. 156B, § 75, as amended by St. 1986, c. 186, § 2 (see now G. L. c. 156D, § 12.02[8]). Despite this, the defendants, on January 28, 1999, accepted, on behalf

---

[6]The defendants maintain that the $400,000 figure that they agreed to accept was reasonable because Twin Hills, the corporate maker of the promissory note, was in a Chapter 11 bankruptcy; a bankruptcy judge had valued the note's collateral at $432,000; and, while the Shelzis had personally guaranteed the note, they had threatened personal bankruptcies should there be an attempt to enforce the obligation.

[7]The plaintiff admitted at trial that his conditions rendered his offer less valuable than the transaction that was available with the Shelzis.

[8]By St. 2003, c. 127, §§ 22-24, corporations previously subject to G. L. c. 156B became subject, effective July 1, 2004, to G. L. c. 156D, inserted by

of Summer Hill, $400,000 from Twin Hills and discharged the mortgage. Twin Hills also paid $150,000 in back real estate taxes assessed on the subdivision, thereby completing the various transactions with $90,000 in cash. Frustrated with respect to his objective to have Summer Hill acquire and develop the property, the plaintiff sued the defendants for breach of fiduciary duty.

2. *Discussion.* The essence of the plaintiff's claim is that the parties agreed to use the promissory note and mortgage obtained from Wakefield Savings Bank as leverage with which to acquire the Twin Hills subdivision for development purposes. The closely held corporation, Summer Hills, was formed for this purpose. According to the plaintiff, it was never the parties' intention merely to purchase a promissory note and mortgage and then resell it, even at a substantial profit. Rather, the corporate objective was acquisition and development of the subdivision and, to the extent that the defendants chose to minimize their risk by agreeing to discount and sell the note rather than pursue the corporate purpose, they breached their fiduciary obligation to the minority stockholder.

The principles governing relationships among stockholders in closely held corporations are easily stated in the abstract, although they may be difficult to apply in some circumstances. Such corporations have been likened to partnerships, thereby creating a heightened level of fiduciary duty among the participants. There is an obligation on the part of each stockholder to exercise the "utmost good faith and loyalty" to each other stockholder, a duty more exacting than that imposed on officers and directors in publicly traded corporations. See *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593-594 (1975). Stockholders in a close corporation "may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Id.* at 593. The more intense fiduciary duty imposed in the circumstances is designed to prevent the unique

St. 2003, c. 127, § 17. The former G. L. c. 156B, § 75, was replaced by G. L. c. 156D, § 12.02.

opportunities available in close corporations to oppress or "freeze out" minority interests.[9]

The majority must, however, still be permitted to run the company, and they may defend against a claim that they have breached their fiduciary duty to the minority by showing that their actions were guided by a legitimate business purpose. See *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 851 (1976). Thus, the majority is given considerable discretion to make business judgments, even though such judgments may be adverse to minority interests. *Ibid.* At the same time, the minority may challenge the majority's business judgments by showing that the corporate objective could have been achieved in alternative ways less harmful to the minority position. *Id.* at 851-852.

The plaintiff claims that the defendants violated these principles to his detriment, and the defendants contend that the evidence is insufficient to support such a result. The trial judge focused on the issue with precision in connection with the defendants' motions for judgment notwithstanding the verdict or for a new trial, and provided a comprehensive and accurate statement of the evidence on which the jury could have relied. Emphasizing the parties' written agreement of March 16, 1998, and related testimony regarding the parties' intentions, as well as the defendants' statutory violation in selling the note and mortgage without a two-thirds vote of the stockholders, the judge concluded both that the evidence was legally sufficient to support the verdict and that the verdict was not so greatly against the weight of the evidence as to require that there be a new trial. We are not persuaded that the evidence was sufficient to justify a finding of breach of fiduciary duty on the part of the defendants.

The question here differs considerably from what is ordinarily present in cases of breach of fiduciary duty in closely held

[9]Examples include refusing to declare dividends, draining off corporate earnings with exorbitant compensation to majority stockholder-officers, "sweetheart" stock purchase transactions favoring the majority, depriving the minority of employment opportunities in the company, selling assets at an inadequate price to majority shareholders, and refusing to purchase minority shares at prices comparable to those paid to the majority. *Donahue, supra* at 588-589.

corporations. In the normal situation, it is not difficult to identify a duty on the part of the majority not to take advantage of their positions to siphon assets from the corporation or to deprive the minority of their allocable share of corporate income or employment opportunities. It is likewise ordinarily not difficult to determine when that obligation has not been fulfilled. In the present case, the plaintiff's claim is more subtle. His accusation is that the majority stockholders, without authorization to do so, ignored the very purpose for which the corporation was formed; pursued their own investment strategy, which differed from his own; and squandered the corporate opportunity that he had located and introduced to the enterprise. The breach of fiduciary duty, the argument continues, is found in the refusal of the defendants to press forward with an acquisition of the subdivision rather than settling for merely realizing a profit on the promissory note.

To prevail on this argument, it was incumbent on the plaintiff to show that the defendants as majority stockholders had in fact committed themselves to such an undertaking when the corporation was formed. He offered as evidence of the defendants' commitment the letter agreement executed on March 16, 1998, by the three principals.[10] The agreement is in the form of a letter written by the defendants and countersigned by the plaintiff as an indication of his assent. The letter begins: "The Palms and I [Pearson] would enjoy working with you on the above subdivision on the following basis." It then states that "[y]ou [the plaintiff] will be responsible for running the project and managing the construction of the road and building all the houses we decide to build," and provides that "fees and profits" available after the payment of expenses shall be divided with Pearson receiving twenty-five percent, Palm (see note 3, *supra*) twenty-five percent, and the plaintiff fifty percent.

----

[10]The plaintiff did not assert a contract claim under the agreement. Whether the agreement is legally enforceable as an independent contract is not dispositive with respect to an analysis regarding an alleged breach of fiduciary duty. An agreement such as this, a company policy, or an understanding among stockholders may have bearing on the questions whether a duty existed and, if so, whether it was breached. See *A.W. Chesterton Co.* v. *Chesterton*, 128 F.3d 1, 6-7 (1st Cir. 1997). The answers turn, of course, upon the terms of such agreement, policy, or understanding.

On the subject of financing, it was agreed that the defendants would be responsible as follows: "We [Pearson and Palm] will obtain and continue the financing (as long as the project is economically feasible) and contribute or loan funds for the development of the property or properties and manage the business and financial affairs of the development." It is provided that vendors will be selected by the defendants with the plaintiff's "advice and consultation." The agreement calls for advances to the plaintiff against his share of fees and profits as he completed various parts of construction projects, as well as certain bonuses in the event he was able to complete certain phases of the subdivision roadway within allotted times. The agreement contemplates the formation of a corporation "to develop the property or properties," the plaintiff to own forty-eight percent of the stock and the defendants to own twenty-six percent each.

The plaintiff points to the letter agreement as establishing that the defendants had already committed themselves to an acquisition of the subdivision from the Shelzis and were now arranging for the various rights and responsibilities of the principals once the property was in fact obtained. We do not believe that the letter agreement can reasonably be construed in such a fashion. The parties entered into the agreement at a time when their ability to acquire the subdivision was highly uncertain. While they had obtained the Twin Hills promissory note and the accompanying mortgage (on nine of the approximately sixty lots), they were a considerable distance from actually owning the property, and in fact were just preparing to commence negotiations with the Shelzis on the subject. That their views regarding the potential value of the property might be shared by others who would compete with them to acquire the asset was certainly a possibility. The face value of the promissory note could have been of slight comfort, given that Twin Hills (the maker of the note) was in bankruptcy and the Shelzis (the guarantors) were threatening personal bankruptcies in the event that substantial claims were made under their guarantee.

Furthermore, the interpretation of the letter agreement that the plaintiff advances requires a finding that the defendants

intended to bind themselves to acquire the subdivision regardless of cost, and notwithstanding that the plaintiff was not himself responsible for contributing or obtaining capital for the venture. In addition, once the property was acquired, the defendants would be obligated to provide or raise substantial amounts. The letter agreement does not express any of this. Indeed, it states the opposite: "We [the defendants] will obtain and continue the financing (as long as the project is economically feasible) . . . ."

As the defendants observe, such an arrangement would certainly be unusual and would result in a minority stockholder becoming legally empowered to compel the majority to contribute additional capital to the corporate enterprise when the minority stockholder is not obligated to contribute even a pro rata share. As we have indicated, nothing in the letter agreement suggests that the defendants had accepted such an arrangement; rather, the letter provides for the respective responsibilities of the parties if and when the property has been acquired, with the agreement stating expressly that the defendants shall be responsible to continue financing the venture only "as long as the project is economically feasible."

We conclude, therefore, that the letter agreement of March 16, 1998, could not by itself permit a finding that the defendants violated a binding commitment to acquire the subdivision and that they thereby breached a fiduciary duty to the minority stockholder. Thus, we look elsewhere in the record to determine whether other evidence justifies such a finding, and we remain unconvinced. The plaintiff testified to considerable discussion and inquiry, prior to the letter agreement, regarding the project's feasibility, all obviously contingent upon the parties' ability to acquire the property from the Shelzis. He acknowledged that the discussions were focused, at least in part, on the economic feasibility of the project ("We were trying to find out if it was cost effective to acquire the property"). He acknowledged that, when he commenced discussions on the subject with Pearson in 1996, Pearson did not commit to the project regardless of cost, and the plaintiff pointed to the March 16, 1998, letter agreement as demonstrating that the commitment came about subsequently. He conceded, however, that the letter agreement

does not by itself contain a provision obligating the defendants to develop the property regardless of circumstances. Accordingly, we find nothing in the remaining evidence that supports the plaintiff's view that the defendants were obligated as fiduciaries to acquire the subdivision.

In a related argument, the plaintiff suggests that the defendants breached their fiduciary obligations by not pursuing acquisition of the property more aggressively. The argument appears to be that the defendants could have made the Shelzis an offer that was reasonable to both sides, but that the defendants failed to do so. The evidence does not support the proposition. The agreement on which the plaintiff relies was executed, and the corporation was formed, in March, 1998. By early May, 1998, the Shelzis were demanding a release of the secured debt plus $250,000 in return for the subdivision. The plaintiff does not suggest that the defendants should have agreed to that proposal. Rather, he argues that they could have acquired the property for release of the debt and $90,000 (an amount equal to the cash eventually received by the Shelzis in the transaction with Premier Homes). This requires considerable speculation. There was no showing that the Shelzis were willing to sell to Summer Hill for such an amount. Furthermore, the sale to Premier Homes generated cash that the Shelzis used in part to pay $150,000 in back real estate taxes; thus, the Shelzis would presumably have demanded at least that amount in addition to the $90,000 posited by the plaintiff, therefore requiring an outlay by the defendants of $240,000.

On May 18, 1998, Twin Hills committed to a purchase of the subdivision by Premier Homes, effectively ending any realistic opportunity for Summer Hill to obtain the property. Further efforts by the defendants to convince the Shelzis to sell to them would not only have required an offer of at least the value of that made by Premier Homes, but could well have exposed the defendants and Summer Hill to charges of tortious interference. The defendants at this point appear to have done all that was reasonably possible, specifically, deal with the Shelzis to determine an appropriate discounted value of the promissory note and, alternatively, accept a deed to the property in lieu of foreclosure in the event that the contemplated sale to Premier

Homes did not materialize. That they negotiated a payment of $400,000 when a bankruptcy judge had determined that the value of the security was $432,000 can hardly be deemed an unreasonable business decision.[11]

The judge identified as a second basis for the jury's verdict evidence that the defendants sold the note and mortgage (i.e., all of the corporation's assets) notwithstanding the absence of a two-thirds vote of the stockholders. At the time in question (January 27, 1999), G. L. c. 156B, § 75, as amended by St. 1986, c. 186, § 2 (see note 8, *supra*), provided that a corporation "may . . . authorize . . . by vote of two-thirds of the shares of each class of stock outstanding and entitled to vote thereon, the sale, lease or exchange of all or substantially all of its property and assets, including its goodwill, upon such terms and conditions as it deems expedient . . . ." There is no dispute that the promissory note and the mortgage on nine lots constituted all or substantially all of Summer Hill's assets. Nor, despite the defendants' contention otherwise, does there appear to be much doubt that the defendants violated G. L. c. 156B, § 75, by selling those assets by vote of only fifty-two percent of the outstanding shares. The question is whether, in the circumstances, that violation is enough to warrant a finding that the defendants breached a fiduciary duty to the plaintiff.

Addressing this question at the hearing on the defendants' motion for directed verdict, the trial judge stated: "I simply don't see that it's a breach of fiduciary duty, even if it is a violation of the statute . . . . There is no self-dealing here, there is no action taken that is not in the interest of the corporation, as a corporation." We agree. We are aware of no decision that equates automatically a violation of G. L. c. 156B, § 75, or its successor, with a breach of fiduciary duty. Nor does the evidence in the present case permit such a finding. There was no wrongful diversion of corporate assets, see *Pupecki* v. *James Madison Corp.*, 376 Mass. 212, 213-215 (1978), or other fraud

---

[11]Apart from the plaintiff's claim that the defendants were obligated to acquire the subdivision, and that nothing else would do, there is no intimation in the record of any fraud, self-dealing, or other impropriety with respect to the defendants' decision to accept $400,000 for the promissory note. Indeed, the defendants, who would retain fifty-two percent of any profit, had every incentive to exact the highest available price.

or preference at the expense of the minority stockholder, see *Johnson* v. *Witkowski*, 30 Mass. App. Ct. 697, 709 (1991). On the contrary, the sale took place when there was no longer a realistic opportunity to acquire the subdivision, thus frustrating the purpose for which the corporation was founded. Given the situation, we are not persuaded that the defendants' business decision to sell the note and mortgage for a defensible price constitutes, without more, a breach of fiduciary duty.[12]

We agree as well with the assessment of the trial judge, expressed in his statement of reasons for denying the defendants' posttrial motions, that, apart from the letter agreement of March 16, 1998, and the violation of G. L. c. 156B, § 75, other claims of breach that emerged in the evidence were insufficient to support the verdict. This includes any suggestion by the defendants that they might challenge whether the plaintiff was in fact a forty-eight percent stockholder of Summer Hill. To the extent that there was such a challenge, which is uncertain, it would not by itself warrant the jury's finding. In the final analysis, this record did not permit the jury to conclude that this plaintiff, who invested no cash in the enterprise, who can point to no specific agreement by the defendants to acquire the subdivision regardless of circumstances, and who ultimately realized a return of close to $150,000 (his pro rata share of the corporate profit) in a period of less than one year after formation of the corporation, had been a victim of the kind of majority wrongdoing for which damages are awarded. See *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. at 588-589, 593-594.

3. *Disposition.* The amended judgment is reversed, and the case is remanded to the Superior Court for entry of a new judgment awarding the plaintiff forty-eight percent of escrowed proceeds from Summer Hill's sale of the promissory note and mortgage, plus a pro rata share of any interest earned.

*So ordered.*

---

[12]In light of this conclusion, it is not necessary to consider the defendants' argument that the sole remedy for a violation of G. L. c. 156B, § 75, is found in G. L. c. 156B, § 76 (providing for demand by dissenting stockholder for appraisal of, and payment for, his shares).