Gants, Ralph D., J.
The plaintiff, Peter Diehl Murphy (“Peter”), in his capacity as the sole trustee of the Jane D. Murphy Trust for the Benefit of John D. Murphy and the Marjorie Blake Trust for John D. Murphy, known collectively as the Murphy-Blake Trust, has brought a claim against two of his sisters, the defendants Sarah Murphy (“Sarah”) and Beth Murphy (“Beth”), for breach of the fiduciary duty they allegedly owed to the Murphy-Blake Trust. This claim was one of many that Peter and other members of the Murphy family brought against Sarah, Beth, and still other members of that same family alleging breach of fiduciary duty, fraud, and unjust enrichment regarding the redemption of stock in the two family companies — F. Diehl & Son, Inc. (“Diehl & Son”) and Diehls, Inc. (collectively, “the Companies"). Summary judgment was granted to the defendants as to all the claims except this one which, in contrast to the others, alleges a breach of fiduciary duty against Sarah in her capacity as a Trustee of the Murphy-Blake Trust rather than simply as an officer or director of the Companies.[1]
The parties waived any right to a jury trial and proceeded with a bench trial as to liability, which continued for six days, from September 5 until September 13, 2006. Based on the evidence at trial, including the testimony of the nine witnesses and the 69 exhibits admitted into evidence, this Court makes the following findings of fact and conclusions of law.[2]
FINDINGS OF FACT
The Companies had been founded by Frederick Diehl in 1858 and continued to be owned and operated by members of the Diehl family until they were merged into the acquiring company, Squinden Merger Corp., in 2004. In 1995, Sarah served as the President of the Companies and Beth as their Treasurer. Both also served on the Board of Directors of the Companies. In December of that year, Richard Murphy, known to the family as “Uncle Dick,” declared that he wished to redeem the shares held by him and his family, both individually and beneficially through the Murphy-Blake Trust, and invest the proceeds in the stock market in order to diversify their assets and increase their returns on investment. Uncle Dick’s desire to redeem set in motion a series of events which ultimately led to this lawsuit.
In order to accommodate Uncle Dick’s wish to redeem his family’s holdings in the Companies, the Companies retained Shields and Co. (“Shields”), an investment banking firm, to determine the fair market value of the common stock of the Companies. At the time, the Companies operated four businesses in Wellesley: a retail hardware and garden center, a home heating business, a lumber business, and a real estate *573 rental business that managed its fifty properties. The Companies also owned a bit more than twenty acres in Wellesley, most of it on both sides of Linden Street. Shields completed its preliminary analysis on September 11, 1996, determining that the fair market value of each common share in Diehl & Son as of September 30, 1996 was $270 and the fair market value of each common share in Diehl, Inc. as of December 31, 1995 was $653.[3] Both valuations included a 20 percent discount for the sale of a minority interest and a further 35 percent discount for lack of marketability. While the valuation per share for Diehl & Son was provided as of September 30, 1996, Shields relied on financial statements for the year ending September 30, 1995 and real estate appraisals as of July 15, 1996.
After the retention of separate counsel and extensive negotiations among the Companies and Uncle Dick’s side of the family, a redemption agreement was entered into on May 29, 1998 in which the Companies agreed to redeem all the common shares held by Uncle Dick and his side of the family at prices slightly different from the fair market value established by Shields — $285 per share for Diehl & Son common shares and $632 per share for Diehl, Inc. common shares (“the 1998 redemption price”).[4]The Companies agreed to obtain outside financing to obtain the funds needed to accomplish this substantial redemption of shares, and ultimately borrowed $2.9 million to pay for the redemptions. This redemption agreement was approved by the Companies’ Boards. In addition, since Uncle Dick’s side of the family were also beneficiaries in the Murphy-Blake Trust, a Compromise Agreement was also executed that day in which the Murphy and Blake Share of the Trust was divided into two equal Shares, one for the benefit of John Murphy’s family and the one for the primary benefit of Uncle Dick’s family. The latter became known in the family as the New York Trusts (apparently because Uncle Dick and much of his family lived in New York), while the former continued to be known as the Murphy-Blake Trust.
Although the redemption agreement was entered into in May 1998, the agreement contemplated that it would not become final until a tax opinion had been received by the Internal Revenue Service. Once a favorable decision was obtained, the redemption took place on October 13, 1999. Through this redemption, the Companies redeemed at the 1998 redemption price all of the common shares held by Uncle Dick and his family, both individually and beneficially through the New York Trusts.
Uncle Dick’s interest in redeeming his family’s shares and investing the proceeds in the booming stock market, and the Companies’ willingness to accommodate him, caused other family members from the Massachusetts side of the family to ask to redeem some or all of their shares. Consequently, Peter redeemed 80 shares of Diehl & Son at the $285 redemption price in November and December 1997, before the finalization of Uncle Dick’s redemption agreement, and redeemed his remaining 860 shares in Diehl & Son and his remaining 36 shares in Diehls, Inc. on October 15, 1999, two days after the closing on Uncle Dick’s redemption, also at the 1998 redemption price. Joan Murphy (“Joan”) redeemed all of the common shares in the Companies that she and her son owned on May 29, 1998 at the 1998 redemption price. Susan Murphy (“Susan”) redeemed all her shares in the Companies on October 15, 1999, and all the shares of her children on December 29, 1999, also at the 1998 redemption price. Ann Murphy (“Ann”), the mother of Sarah, Beth, Peter, Joan, Susan, and Jane Bolling (“Jane”), redeemed all her common shares in Diehl & Son on December 19, 1999 and in Diehls, Inc. on February 16, 2000 at the 1998 redemption price.[5] Consequently, within four months of the closing on the redemption of shares by the New York side of the family, every family member except Sarah, Beth, and Jane had redeemed all the shares they individually held in the Companies at the 1998 redemption price, which was based on the valuations established by the Shields appraisal in 1996.[6]
The Murphy-Blake Trust
By 1992, Sarah and Peter were the co-trustees of the Murphy-Blake Trust, and they remained so until Sarah resigned on December 31, 2003, when Peter became the sole Trustee. After the Compromise Agreement was executed on May 29, 1998, separating the New York Trusts (with Uncle Dick’s side of the family as beneficiaries) from the Murphy-Blake Trust, the beneficiaries of the Murphy-Blake Trust were the six surviving children of John Murphy — Sarah, Beth, Joan, Jane, Peter, and Susan (“the six siblings”). At the time of the split arising from the Compromise Agreement, apart perhaps from small quantities of cash in a bank account to pay various operating expenses, the sole assets of the Murphy-Blake Trust were 6,711 common shares in Diehl & Son, 251 shares in Diehls, Inc., and 174 preferred shares in Diehl & Son.
Although Peter was a co-trustee with Sarah until her resignation, for all practical purposes, Peter had abdicated his role as Trustee and permitted Sarah to make all the decisions and perform all the work. He played no role in Trust decisions; nor did he seek to play any role. All he did on behalf of the Trust was sign those documents that required the signatures of both Trustees, such as the Trust’s tax returns prepared by family accountant Margaret Barron and the signature cards to open the Trust’s bank account at Boston Federal and, later, the Middlesex Savings Bank.
Sarah acted as if she were the sole Trustee, and treated Peter as if he were solely a beneficiary.[7] If she conferred with him as to Trust matters, it was only at family meetings with the other sibling-beneficiaries. Apart from those family meetings, she never conferred *574 with him as to Trust matters or to seek his approval for any Trust decision.
Sarah delegated various Murphy-Blake Trust matters to Beth. Beth was the Trustee of another family trust, the Frieda Pfeiffer Trust # 1 (“the Pfeiffer Trust”), whose current beneficiary was Bruce Pfeiffer. Beth was a beneficiary but not a trustee of the Murphy-Blake Trust. Beth kept the Murphy-Blake Trust checkbook and handled all the books and paperwork. Perhaps most significantly in the context of this case, Sarah made Beth the liaison with the Trust attorneys, meaning that she directed the attorneys to speak with Beth as to all legal matters involving the Murphy-Blake Trust. Sarah relied on Beth to relate the attorneys’ advice to her, and rarely spoke with them herself.
The Trust’s Redemption of Companies’ Stock
The decision of Uncle Dick to redeem his family’s shares in the Companies caused Sarah and her siblings to consider whether it was wise for the John Murphy side of the family to have only Companies’ stock in the Murphy-Blake Trust if the Richard Murphy side of the family thought it wise to redeem and diversify their investment portfolio. On November 19, 1997, the Murphy-Blake Trust’s attorney at Ropes & Gray, Ed Joyce, in the context of discussing negotiations with Uncle Dick’s attorney regarding the split of the Murphy-Blake Trust, told Beth that Uncle Dick’s attorney had argued that the Trustees of the Murphy-Blake Trust should have diversified the Trust’s portfolio over the years and Uncle Dick could sue for breach of fiduciary duty for failing to diversify. According to Beth, Joyce told her that Uncle Dick had a good argument on this point and could win if brought to court. Beth and Sarah learned of this advice, but it is not clear whether any other sibling was told of it.[8]
At some time before Sarah and Beth began to redeem the Companies’ shares held by the Murphy-Blake Trust, the six siblings met to discuss various family financial matters, including the conduct of various family trusts. Each of the six siblings recall that such a meeting took place but they vary as to what was discussed, when the meeting was held, and how many meetings were held to discuss these matters prior to the final redemption on September 22, 2000. This Court shall summarize below the testimony of each as to these meetings:
Sarah remembered calling a family meeting to discuss the diversification of the Murphy-Blake Trust and Pfeiffer Trust investment portfolios, attended by all six siblings, but is not sure of the date. She recalled that they agreed that their side of the family was the only side who still worked at the Companies and they should have the same opportunity as Uncle Dick’s side to redeem and invest in the stock market during the “go-go” years. At this meeting, the siblings observed that they still had their employment and pension plans through the Companies and, with a bad oil spill, they could lose it all.
According to Sarah, everyone agreed to sell all the Companies stock held by the Murphy-Blake Trust and diversify into other investments.[9] They also agreed to redeem only from cash flow, because Beth did not want the Companies to be burdened by more debt to pay for the redemptions.
Beth recalled a family meeting in February 1997 in which the six siblings decided, in essence, that Uncle Dick’s side of the family was redeeming and they should, too. She recalls they agreed to redeem Murphy-Blake Trust shares as cash flow from the Companies became available. Beth testified that she strongly suggested redeeming only from cash flow because she did not want the Companies to take on debt, having already taken on a $2.9 million debt to redeem Uncle Dick’s family’s shares. She does not recall any discussion as to how many Companies’ shares would be redeemed, whether there would be a total redemption of shares, or the price to be paid per share.
Jane recalled that diversification was discussed at various family meetings, but she did not recall discussing any plan to diversify the Murphy-Blake Trust, or any specific discussion about redeeming any Companies’ shares held by the Trust. Indeed, Jane did not even know that she was a beneficiary of the Murphy-Blake Trust until this lawsuit was filed. She vaguely recalls that she heard complaints at these meetings about the Companies’ dividends being low, and that they could get greater returns in the stock market.
Joan recalled a family meeting attended by her, Sarah, Beth, Jane, and Peter, but not Susan, at some time after Joan left her employment at the Companies, which was in May 1998. She recalled that Beth said that Bruce Pfeiffer had been complaining about wanting more income from the Pfeiffer Trust, and that she was going to be looking to redeem some Companies’ shares held by that Trust to do some diversifying for Bruce. Sarah suggested that it would be nice if the Murphy-Blake Trust also did some diversification. There was general agreement that diversification was a good idea but no detailed discussion. No redemption plan was presented or considered, and no specifics were discussed. There was no discussion as to whether some or all of the stock would be redeemed, the amount of the redemptions, the timing of the redemptions, the price of the redemptions, or the investment advisor that would be retained to invest the proceeds of any redemption. Joan left the meeting understanding that the Murphy-Blake Trust was going to redeem a small quantity of shares and invest the proceeds in the stock market, and that there would be further discussion before anything more was done.
Peter recalled a family meeting in Sarah’s office either before Uncle Dick’s redemption agreement *575 was executed on May 29, 1998 or soon after, attended by, at least, him, Sarah, Beth, and Joan (he was not sure whether Jane or Susan were there). He testified that they discussed the split of the Murphy-Blake Trust that arose from Uncle Dick’s redemption, and Uncle Dick’s plans to invest the proceeds of the redemption with Loomis Sayles Funds (“Loomis”). Peter reported that Beth said she planned to redeem some Companies’ shares held by the Pfeiffer Trust because the beneficiary wanted more income from that Trust. He recalled that the concept of diversifying the Murphy-Blake Trust was generally discussed and that he was excited about the prospect of diversification and investing the proceeds in the stock market. He said that no diversification plan was discussed. Specifically, he said there was no discussion of how many shares would be redeemed, whether all the shares would be redeemed, and who would serve as the investment advisor after the redemption. He also recalled no discussion as to how the redemption would be financed, but he understood that Beth would control the timing.
Susan recalled only one family meeting that occurred when she was working at the Companies at some time between September 1997 and October 1999. The only thing she remembered about the meeting is that Margaret Barrett was there; she does not recall whether diversification was discussed. Indeed, she recalled nothing about the content of the discussion.
This Court has considered all of their testimony, as well as the various related exhibits, and concludes that Joan’s and Peter’s recollections are closest to the truth. This Court finds that there was a family meeting held in Sarah’s office at the Companies shortly after May 29, 1998, probably in June 1998, when both Uncle Dick’s redemption agreement and the Compromise Agreement had been executed. Peter recalls the meeting took place either just before or after the split and Joan is certain that she was no longer employed at the Companies when the meeting took place; she left the Companies’ employ in May 1998. Certainly, one would expect that a family meeting would be needed to chart a course for the John Murphy side of the Murphy-Blake Trust once Uncle Dick’s redemption and the split in the Murphy-Blake Trust had occurred.
This Court also finds that all the six siblings were at the meeting. While Susan and Jane recall nothing of the meeting, both were working at the Companies at this time and would likely have been there.
This Court also finds that, at this meeting, there was general agreement that the Murphy-Blake Trust should begin diversifying and it was generally understood that Beth would redeem some of the Trust’s shares in the Companies as the Companies’ cash flow allowed. Since Uncle Dick had just redeemed all his shares at the 1998 redemption price, and Joan and Peter had just redeemed their shares at that price (all of Joan’s shares and some of Peter’s), it was understood that the redemptions of shares by the Murphy-Blake Trust would be at that same share price. That, however, was the extent of the agreement. There was no agreement (or even discussion) that the Murphy-Blake Trust would redeem all of its Companies’ shares, or that the 1998 redemption price would always be appropriate, or that Beth would redeem as many shares as was possible from cash flow. Since there was no discussion about the need for an investment advisor or the selection of an investment advisor, this Court infers that the understanding reasonably derived from that meeting was that Beth would slowly begin redeeming some of the Trust’s shares in the Companies as cash flow allowed, at the 1998 redemption price, and that an investment advisor would be selected to invest these proceeds once they grew significant in amount.
Despite the general agreement at this June 1998 meeting that some degree of diversification of the Murphy-Blake Trust should be done, the first redemption that occurred was not until October 13, 1999, the same day as the closing on the redemption of Uncle Dick’s family’s shares. At that time, Beth redeemed 125 shares of Diehl & Son at the $285 redemption price, yielding $35,625, which was used to pay various legal fees incurred on behalf of the Trust in the split.
Even though the redemptions did not begin until the closing on Uncle Dick’s family’s redemptions in October 1999, Beth and Sarah had already decided to redeem the Companies’ shares for the purpose of diversification. On September 24, 1999, at Susan’s request, Beth wrote a letter to Susan’s attorney describing the various Trusts in which Susan was a beneficiary. At that time, Susan’s attorney was preparing a pre-nuptial agreement to present to Susan’s fiance, and apparently wished to learn more of her financial circumstances.[10] In that letter, Beth wrote that the Trustees of the Murphy-Blake Trust “plan to diversify the assets of the Trust. However, any such diversification will depend on the cash flow of the companies.”
The first redemptions by the Murphy-Blake Trust that were done to diversify the Trust’s assets (rather than to pay legal expenses) occurred on February 3, 2000, when Beth redeemed all of the Trust’s 159 shares in Diehls, Inc. at the 1998 redemption price of $632 per share, netting $100,488. This redemption was made from the Companies’ cash flow without the specific knowledge or approval of anyone other than Sarah.
The redemptions of these Diehls, Inc. shares meant that, for the first time, the Trust had a substantial amount of money to invest in the stock market. Sarah had received from Uncle Dick the name of his investment advisor with Loomis — Robert lx, then based in *576 New York — and she met with lx when he visited Boston. Sarah and Beth decided to invest with Loomis without conferring with Peter or any of the other beneficiaries. On March 6, 2000, Sarah and Beth executed a New Account Application with Loomis. Sarah signed her name as Trustee. Beth signed Peter’s name as Trustee without Peter’s knowledge or approval.[11]
Having sold all the Trust’s Diehls, Inc.’s shares on February 3, 2000, Beth, with Sarah’s blessing, continued to redeem the Trust’s shares in Diehl & Son as cash flow became available. On March 30, 2000, she redeemed 200 shares at the $285 redemption price. On April 23, 2000, she redeemed 35 more shares at that price. On May 24, 2000, she redeemed 200 more shares at that same price. On July 5, 2000, she redeemed another 200 shares at that price. On August 31, 2000, the Companies closed on the sale of its oil business (but not the land on which the oil business sat). The proceeds from this sale provided cash flow sufficient to redeem all of the remaining 5,402 common shares in Diehl & Son held by the Trust at the $285 redemption price on September 22, 2000. Indeed, all the after-tax proceeds from the sale of the oil business were used to redeem Companies’ shares held by the Murphy-Blake Trust and the Pfeiffer Trust.[12] Following this final redemption, the only Companies’ shares that continued to be held by the Murphy-Blake Trust (and remained with the Trust until the merger) were 174 preferred shares in Diehl & Son, valued at $100 per share and paying dividends at nine percent per year.
Neither Beth nor Sarah told Peter or any of the beneficiaries that they were redeeming all the Companies’ shares held by the Murphy-Blake Trust; nor did they seek anyone’s approval for this final redemption. The minutes of the December 5, 2000 meeting of the Diehl & Son Board reflects that Beth told the Board that the proceeds from the sale of the oil business were used to diversify the Trusts but, by December 5, 2000, Beth, Sarah, and Jane were the only siblings remaining on the Board. Susan was never a director. Joan was a director, but resigned on June 12, 1998 after she redeemed her and her son’s Companies’ shares. Peter was forced to resign on October 31, 1999 after he had redeemed all his shares in the Companies.[13]
This Court, however, finds that Peter, Joan, and Susan knew or should have known that at least some of the Companies’ shares had been redeemed when they, with the other siblings, received a September 28, 2000 memorandum from Sarah inviting them to a November 15, 2000 meeting in her office at the Companies. This memorandum stated that Pam Czerkanski from Loomis would be at the meeting to discuss “future investments and direction for the above three trusts,” referring to the two Murphy-Blake Trusts and the Pfeiffer Trust. The memorandum also claimed to enclose three sheets (one for each Trust) with tax projections on the sale of Companies’ stock. While this Court finds that the enclosures were missing from the memorandum, this memorandum alone and the meeting that followed would have made clear to all the siblings that at least some Companies’ shares had been redeemed to diversify the Trust and that the proceeds from these redemptions were being invested through Loomis. Indeed, it would have made no sense for the beneficiaries to discuss investments with Loomis if the Trusts continued to hold only Companies’ shares.
Loomis routinely brought to such meetings an informational package for the beneficiaries that included asset allocations, recent transactions, and investment performance, and these would have been provided to each beneficiaxy who showed up at the November 15, 2000 meeting. While the Loomis information, by itself, would not have allowed the beneficiaries to learn how many shares had been redeemed from the Murphy-Blake Trust, because it lumped the Murphy-Blake Trust’s assets together with the Pfeiffer Trust’s assets, it would certainly have suggested to a reasonable person reading it that the Murphy-Blake Trust had a considerable amount of money invested with Loomis, which it had obtained through the redemption of Companies’ shares. This suggestion would have been reinforced in 2002 when the Murphy-Blake Trust beneficiaries received a Trust check from Sarah in the amount of approximately $18,000, which was roughly six times greater than the dividends before diversification.
Moreover, Joan and Jane joined Beth and Sarah for a meeting on October 18, 2001 with Pam Czerkanski and Robert lx of Loomis in which they discussed the investment performance of the Murphy-Blake Trust and Pfeiffer Trust. Czerkanski and lx provided books of information on the Trusts’ collective performance to those who attended this meeting. On October 23, 2001, Sarah wrote a memorandum to all the siblings, including the two who missed the October 18 meeting — Peter and Susan — describing the meeting and noting that the Murphy-Blake Trust’s portfolio with Loomis contained mutual funds. The memorandum also declared that the Murphy-Blake Trust had invested money gradually into the account with Loomis, in contrast with the New York Trust, which invested its money with a lump sum following the closing on the 1999 redemption.
Although Jane, Joan, Susan, and Peter knew or should have known that the Trust had redeemed a substantial amount of Companies’ stock and invested the proceeds in the stock market through Loomis, none of them, including Peter, ever asked Sarah or Beth for more information about such redemptions. None asked them the price that was received per share or the number of shares sold. Nor did any ask to see the Trust’s books, even though they knew that Sarah *577 held them In her office and that they were available for their review if they asked. Since Joan, Susan, and Peter had themselves redeemed all their shares at the 1998 redemption price in 1998 or 1999, and since they did not ask the price of the Trust’s redemptions or complain about the sales having been made without their knowledge or approval, this Court infers that they understood that the Trust had redeemed its shares at the same 1998 redemption price they had.
While Peter, Joan, Jane, and Susan knew or should have known that Sarah and Beth had redeemed a substantial amount of the Trust’s shares in the Companies, they did not know that Sarah and Beth had redeemed all the Trust’s common shares and that, by September 22, 2000, the Trust continued to own only 174 preferred shares in Diehl & Sons. Nor did they receive any information that reasonably should have led them to reach this conclusion. Indeed, while Sarah’s September 28, 2000 memorandum to them put them on notice that substantial redemptions had already taken place, it would have misled them into believing that not all the shares had been redeemed. The memorandum mentioned the need to discuss “the necessary company appraisal of both Diehls, Inc. and F. Diehl & Son, Inc.,” which it said will “set an accurate stock price for future buy backs.” The letter failed to mention that the issue of “future buy backs” was now moot for the Murphy-Blake Trust, since its last common shares had been redeemed six days earlier. Nor could Peter or the other beneficiaries reasonably determine from the Loomis investment statements that all the Murphy-Blake Trust’s shares had been redeemed, because those statements failed to distinguish between the assets of the Murphy-Blake Trust and the Pfeiffer Trust, and therefore failed to state how much of the Murphy-Blake Trust’s assets had been invested in the stock market.
In conclusion, this Court finds:
There was general, but not specific, agreement by Peter and the other Trust beneficiaries that Sarah, through Beth, would take steps to redeem at least some Companies’ shares held by the Murphy-Blake Trust in order to diversify the Trust’s assets. There was no prior agreement, however, as to the amount to be sold or the price that would be acceptable. Peter, Joan, and Susan understood that redemptions made by the Trust at or about the same time as their own redemptions would be at the same price.
Sarah and Beth redeemed as many Trust shares as they could as cash flow became available, without giving notice or seeking the approval of Peter or the other Trust beneficiaries.
In the months after the final redemption, Peter and the other Trust beneficiaries knew or should have known that Sarah had redeemed a substantial quantity of the Trust’s shares, probably at the same price that had been paid to Uncle Dick for his family’s shares, and invested the proceeds through Loomis in the stock market. They did not know until years later (and reasonably would not have known, given the information furnished to them by Sarah and Beth) that Sarah had redeemed all the Trust’s shares in the Companies.
Neither Peter nor any other beneficiaiy complained about these redemptions or sought to learn more about them until after the merger.
The Legal Advice Provided to Sarah and Beth Regarding the Redemptions
As of October 26, 1999, Beth had already discussed issues regarding the diversification of the Murphy-Blake Trust and the Pfeiffer Trust with Michelle Davis, an associate at Ropes & Gray who, along with Ed Joyce, represented both of these Trusts. On that date, Beth wrote a letter to Margaret Barrett that described various accounting issues that needed to be addressed by Barrett. In closing the letter, Beth wrote:
As for the future administration of the Trust, . . . Sarah and I will be having a meeting with Ropes & Gray in a few weeks to discuss diversification of all the Trusts. Michelle Davis told me that this is a situation with a lot of potential conflicts . . . (As Trustee of the Pfeiffer I want to maximize how much the shares are sold for, but as Treasurer of F. Diehl & Son, Inc. I want to minimize how much is paid out.) I’ll let you know what they advise.
In fact, Davis had handled the closing for Uncle Dick’s redemption on October 13,1999 and had briefly spoken in person with Sarah and Beth about diversification after the closing had been completed. Davis had a few telephone conversations with Beth after the closing, but she appears to have spoken to Sarah only at the closing. Before Davis left Ropes & Gray to devote full time to motherhood, she wrote a memorandum to Joyce on November 24, 1999 summarizing her discussions with Beth regarding diversification of the Murphy-Blake and Pfeiffer Trusts. That memorandum reflects that:
Davis had discussed with Beth the potential conflict of interest that she and Sarah had as trustees of the Trusts and officers and stockholders of the Companies;
Davis had told Beth that an independent appraisal determining fair market value is generally used to resolve this conflict, but the Shields appraisal reflected the fair market value of the Companies in 1995 and may no longer reflect fair market value.
Davis told Beth that, if she or Sarah were to redeem at the price set in the Shields’ valuation, the Trust beneficiaries may have a claim for breach of fiduciary duty.
Davis also acknowledged to Beth that, if the Trusts redeemed at a higher price, the family members who had recently redeemed at the price set in the Shields valuation would be angry, which would *578 upset the family harmony they had worked to maintain.
Davis provided Beth with two possible options: (1) wait at least one year before redeeming any stock and obtain a new appraisal at that time, or (2) have the Trust beneficiaries consent to a redemption at the 1995 appraisal price, although Davis recognized that some of the beneficiaries could not consent because they were minors or not yet born.
Beth told Davis that she and Sarah planned to contact Joyce for advice after they worked out a time frame for diversification, recognizing that their ideal time frame may not be advisable.
Beth denies that she received any of this advice. Indeed, Beth testified that she never received any legal advice from Davis and never discussed diversification with her. More remarkably, Beth testified that she believed Davis was a clerical employee at Ropes & Gray rather than an attorney. This testimony is belied by her own written words to Margaret Barrett on October 26, 1999, which strongly corroborate Davis’s contemporaneous written account of her legal advice in her November 24, 1999 memorandum. It is plain to this Court that neither Beth nor Sarah ever did contact Joyce to seek his legal advice as to their planned timetable for diversification. Joyce does not recall any such meeting or discussion, and no such meeting or discussion is reflected in his billing.
Beth testified that, on two occasions, she telephoned Joyce and asked him how long they could use the valuation prices in the Shields appraisal and he said, “Five years.” She then informed Sarah that Joyce had advised that they could redeem the Murphy-Blake Trust shares at the valuations in the Shields appraisal for five years. Beth said she understood this advice to mean that these prices could be used until September 30, 2000, since she knew that the financial statements for the year ending September 30, 1995 were used to obtain the Diehl & Son valuation. However, when this Court asked Beth if she had provided Joyce with any context for her question or had informed him that she was asking about the prices she could use to redeem Companies’ stock for one of the Trusts, she had no memory that she had.
Beth may indeed have asked Joyce how long she could continue to use the Shields valuations and he may indeed have said five years, but the context for any such questions (or at least Joyce’s understanding of the context of any such questions) was the use of those valuations in tax filings made by the Trusts, not the Trusts’ redemption of Companies’ stock by Trustees who had a conflict of interest. This Court notes that, in Beth’s October 26, 1999 letter to the family accountant, Margaret Barrett, she wrote that Ropes & Gray “is now working on the basis calculations for the same from the ‘new and improved’ Murphy Blake Trusts.” On October 28, 1999, according to Ropes & Gray’s itemized billing records, Davis met with James Lawson, Ropes & Gray’s fiduciary accountant, to discuss the adjusted basis for the Murphy-Blake Trust, and then spoke to Barrett, one would infer, on that same subject. On November 8, 1999, Davis telephoned Beth to discuss the adjusted basis. Joyce, in his testimony, said that he possibly might have told Beth that, when they file gift tax returns with the Internal Revenue Service for clients who have transferred a fractional interest in real estate, they tell clients it is okay to value the transferred property with an appraisal that is three to five years old unless there were significant changes that might affect the valuation. However, Joyce emphatically declared that he did not tell Beth that there was a rule of law that an appraisal price is good for three to five years for a redemption. Nor did he believe there was any such rule of law.
This Court credits Joyce’s testimony that he did not tell Beth that an appraisal is good for three to five years when making a redemption for at least three reasons. First, as mentioned before, there is no billing entry reflecting any such discussion. Second, Joyce testified that there was no such rule of law with a redemption, so it is unlikely that he would have provided Beth with this advice. Third, such advice would have been wholly inconsistent with the legal advice reflected in Davis’s memorandum, which Joyce had read and understood. Joyce, an experienced trusts and estates attorney, would have recognized that Beth’s and Sarah’s conflict of interest could not be so easily resolved by simply using the valuations from the Shields appraisal, which was prepared in 1996. Moreover, even the “three to five year rule” that Joyce may have discussed regarding the filing of gift tax returns had an exception — significant changes that may have affected the valuation. Here, Joyce would have understood that the substantial share redemptions that had already occurred, plus the appreciation in real estate values, would likely have substantially affected the value of the Companies’ shares in 1999.
This Court finds that Beth never received legal advice from Joyce or Davis telling her that the Trusts could redeem Companies’ shares based on valuations that were less than five years old. Indeed, this Court finds that Beth chose not to seek legal advice from Joyce or Davis because she anticipated the advice she was going to receive (having already spoken to Davis) and did not wish to follow it. Rather, Beth chose to interpret advice she may have received from Joyce in a tax context — the advice she hoped she would hear— as applying to the redemptions of Companies’ shares, and decided to proceed on that advice rather than the advice she would have gotten had she discussed with Joyce how she and Sarah, with their inherent conflict of interest, should proceed with the redemptions.
The Events Following the Final Redemption
This Court need not and will not address all the events following the final redemption that led to the family discord that gave birth to the various lawsuits, *579 including the complaint that included the instant claim on behalf of the Murphy-Blake Trust. Rather, this Court will focus only on those events that bear on relevant issues regarding the Murphy-Blake Trust.
As mentioned earlier, Sarah, in her September 28, 2000 memorandum to her siblings, spoke of the need to discuss at their November 15, 2000 meeting the “necessary company appraisal.” Beth and Sarah understood that a new appraisal was “necessary” because the Shields valuation, although prepared in 1996, relied on the Diehl & Son financial statements for the year ending September 30, 1995. In their minds, this meant that the valuation was effectively five years old on September 30, 2000 and had to be updated.[14] Diehl & Son ultimately retained Shields again to conduct a new appraisal. On or about February 28, 2001, the Companies and Shields executed an engagement letter in which Shields agreed to determine the fair market value of Diehl & Son and Diehls, Inc. for a fee of $15,000, plus out-of-pocket expenses. On September 21, 2001, Shields completed its appraisal, finding that the fair market value of Diehl & Son was $1,090 per common share as of September 30, 2000 and that the fair market value of Diehls, Inc. was $3,981 per common share as of December 31, 2000. On October 12, 2001, Beth, as Trustee of the Pfeiffer Trust, redeemed 458 shares of Diehl & Son at the new valuation price of $1,090 per share and redeemed another 550 shares in Diehl & Son at that same price on January 8, 2002.
By at least July 2003, Sarah was upset with Loomis’s performance as investment advisor, and wrote her siblings that it had “mismanaged these trusts.” She was astonished when she learned that the value of the Murphy-Blake Trust’s investment portfolio had fallen by 46 or 47 percent, and was not persuaded by Loomis’s explanation that the Trust was simply “down with the market.” Sarah was also frustrated by Loomis’s apparent unwillingness to provide investment statements that separated the Murphy-Blake Trust from the Pfeiffer Trust, and to assist Margaret Barrett in obtaining tax cost basis to complete her tax and accounting work. Sarah proposed that the Murphy-Blake Trust change its investment advisor, and solicited the advice of her siblings as to the choice of a new investment advisor. Ultimately, she chose the investment advisor proposed by Peter. On December 30, 2003, Sarah resigned as Trustee of the Murphy-Blake Trust, leaving Peter as the sole Trustee. The instant claim is brought by Peter on behalf of the Trust.
In 2004, Squinden Merger Corp. paid $3,777.90 per share for the outstanding shares of Diehl & Son and $9,052.88 per share for the outstanding shares of Diehls, Inc. At the time of the merger, Sarah and her children held roughly 23.2 percent of the shares in Diehl & Son, Beth held 23.0 percent of the shares, Jane held 27.9 percent, and the Pfeiffer Trust held 25.6 percent.
CONCLUSIONS OF LAW
Sarah’s Liability to the Trust
A trustee has a fiduciary duty to the beneficiaries of the trust, similar in scope to the fiduciary duty that a partner owes a fellow partner or that a director owes to the corporation or that a majority shareholder owes to other shareholders in a closely-held corporation. See generally Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 528-29 (1997); Johnson v. Witkowski 30 Mass.App.Ct. 697, 705-07 (1991) (trustee’s duty of loyalty similar to that of corporate director’s). In general, that fiduciary duty means that the trustee must be loyal to and protect the interests of the trust beneficiaries, and must not place her interests before those of the beneficiaries. Johnson at 705; Demoulas at 528-29. While there is case law that states that a trustee must never place herself in a position that is antagonistic to the beneficiaries of the trust, see generally Anderson v. Bean, 272 Mass. 432 (1930), Ball v. Hopkins, 268 Mass. 260 (1929), more recent case law recognizes that life is often complicated and that a trustee may at times find herself in such a position and need carefully to address the potential conflict. See generally Demoulas at 528-29 (1997); Johnson at 705-07. The Appeals Court’s description of such a situation is as apt to the instant case as it was to the case in which it was addressed:
We note initially that the difficulty arises here because of the defendants’ multiple roles. They were the trustees of the trust and were also stockholders, directors, and officers of a close corporation involved in transactions in which they stood on both sides and in which they had a self-interest. In each capacity, the defendants had fiduciary duties. Wearing more than one hat — here, at least three— requires a fiduciary to be very nimble as well as most prudent. While the fiduciary may purport to wear one hat at a particular moment, in truth, all hats are worn together at all times.
Johnson at 704.
To ensure that a fiduciary is both nimble and prudent in dealing with a potential conflict, the Supreme Judicial Court in Demoulas, in considering whether a director of a closely-held corporation usurped a corporate opportunity, established both procedural and substantive safeguards. Demoulas at 532-33. Procedurally, the fiduciary contemplating a prospective corporate opportunity must first offer that opportunity to the corporation, disclosing all material details of the venture, and receive the informed approval of the disinterested directors or shareholders for the fiduciary to take that corporate opportunity for herself. Id. at 532-33. Substantively, if the disinterested directors or shareholders have not approved the fiduciary taking that corporate opportunity for herself, *580 the fiduciary must bear the burden of proving that her conduct was fair to the corporation. Id.
While these safeguards were created in the context of a closely-held corporation, this Court finds that they apply to other fiduciary obligations, including the obligation owed by a trustee to her trust beneficiaries. Applied here, there is no dispute that Sarah, in considering the redemption of Companies’ shares held by the Murphy-Blake Trust, had a conflict of interest between her role as Trustee and her role as a director and officer of the Companies. As Trustee, she had a duly to obtain the best possible price for the redeemed shares in order to maximize the assets of the Trust on behalf of the Trust beneficiaries. As a director and officer of the Companies, she had a duty to obtain the lowest fair price for those shares, in order to protect the assets of the Companies on behalf of the remaining shareholders. She would have been “very nimble as well as most prudent” if she had presented the proposed redemption to the disinterested co-trustee, here Peter, or to all the Trust beneficiaries, and obtained their specific approval to the proposed redemption. Failing that, she would need to bear the burden of proving to the Court that the redemptions were fair to the Trust beneficiaries.
Peter, on behalf of the Murphy-Blake Trust beneficiaries, argues that this Court need not even determine whether Sarah has satisfied either the procedural or substantive safeguard declared in Demoulas because she acted without authority in making all of the redemptions and they should be rescinded on that ground alone. He notes that the Trust Declaration establishing the Murphy-Blake Trust specifically declares, “The Trustees shall not sell or otherwise dispose of any shares of stock of F. Diehl & Son, Inc. unless their decision to sell is unanimous,” and argues that he, although a co-trustee, did not join in the redemption decision. This Court shall not rescind the redemptions on that ground. Peter had essentially abdicated his responsibilities as co-trustee during the entire period of time in which redemptions were contemplated and executed, and resumed those responsibilities only after Sarah resigned on December 30, 2003. By his conduct, Peter had essentially delegated to Sarah sole responsibility for the management of the Trust and given her the equivalent of a blank proxy for all Trust decisions she made. Moreover, even after he learned that Sarah had made redemptions on behalf of the Trust without his specific knowledge and approval, he failed to raise any objection or even inquire into the details of the redemptions, including the amount of shares redeemed and the redemption price. By this conduct, he essentially affirmed her authority to execute such redemptions without his specific approval. See Bowen v. Farley, 256 Mass. 19 (1926).
There is another pragmatic and equitable reason why the rescission of the redemptions would not be fair based solely on Sarah’s failure to obtain Peter’s specific approval. Rescission here is not a realistic equitable alternative, since all the redeemed shares have since been sold in the 2004 merger. The practical consequence of rescission would be that Sarah would be required to pay the Trust the difference between the actual redemption price and the price the shares would have sold at had they been held until the merger. If the redemptions had been fundamentally fair to the Trust beneficiaries and all that Sarah had done was fail to obtain the consent of a co-trustee who had abdicated his responsibilities and essentially asked her to perform all the work, it would be fundamentally unfair to require Sarah to pay this substantial sum to the Trust.
Turning to the so-called Demoulas analysis, Sarah and Beth argue that the redemptions had been approved in advance by Peter, who was a disinterested co-trustee since, apart from the October 13, 1999 redemption that was done to pay the Trust’s legal fees, all the redemptions occurred after October 31, 1999, when Peter was no longer either a director or shareholder of the Companies. They also contend that the redemptions had been approved by all the disinterested beneficiaries. This Court, earlier in this decision, found that there was general, but not specific, agreement by Peter and the other Trust beneficiaries that Sarah, through Beth, would take steps to redeem at least some Companies’ shares held by the Trust in order to diversify the Trust’s assets. This Court also found that Peter, Joan, and Susan understood that redemptions made by the Trust at or about the same time as their own redemptions would be at the same price. This Court, earlier in this decision, also found, however, that there was no prior agreement as to the amount of shares to be redeemed or the price that would be acceptable. This Court now finds that this general agreement and understanding is not sufficient to constitute the specific approval of the disinterested trustees or beneficiaries that is necessary to protect the fiduciary from having to bear the burden of proving the fairness of the underlying transaction to the Trust.
In Demoulas, the corporate opportunity was never presented to disinterested directors, so the Court had no reason to consider what it means to obtain the approval of disinterested directors as to a transaction in which another director has a conflicting interest. The spirit of Demoulas, however, is that the procedural step of obtaining the approval of the disinterested directors presumptively protects the corporation from a substantively unfair transaction by the interested director, because otherwise they would not have approved it, so the court need not scrutinize with the same care (and with the same skepticism) the approved transaction. That procedural protection is not obtained unless the disinterested directors are provided with all the material information necessary to come to an informed decision, and exercise due diligence in providing their approval. The generalized *581 agreement found here by Peter, Joan, Jane, and Susan is insufficient to provide that procedural protection. There was never any specific discussion as to the amount of stock to be redeemed, the timing of the redemptions, or the redemption price. Rather, there was simply a general sense of the meeting that the Trust would benefit from some diversification, and even this sense of the meeting was not reached through the exercise of due diligence. In short, there is no reason for this Court to presume that the redemptions were fair based simply on the acquiescence of the disinterested director and beneficiaries to the suggestion of Trust diversification.
Therefore, this Court imposes on Sarah the burden of proving that the redemptions were fair to the Trust beneficiaries. In considering whether the redemptions were fair, this Court needs to examine each redemption separately and consider, at least, the following factors:
1. Did the redemption price reflect what a reasonable person would understand to be the fair market price for the shares? In considering this factor, it is necessary to look to the Diehl & Son corporate by-laws, which specifically address the terms of any redemption. Under the by-laws, the share price to be paid in any redemption is either “the value agreed upon by the corporation and the stockholder whose shares are to be purchased,” or, if they are unable to agree, the value determined from the “adjusted book value of the corporation” or by an independent valuation. If the corporation were to retain an appraiser to determine the redemption price, the cost of the appraiser is to be split equally between the corporation and the shareholder whose shares are to be purchased. The valuation of the shares to be purchased must take into account “the existence of a minoriiy interest and the lack of marketability thereof, if applicable.” By-laws at pp. 10-11.
2. If the redemption had awaited a new valuation, what would have been the cost of that valuation and how long would that would have delayed the redemption? When the second Shields valuation was conducted, it cost $15,000, plus out-of-pocket expenses, and was completed nearly seven months after the execution of the engagement letter.
3. Would redemption at a higher price have adversely affected the relationships among the siblings and risked litigation with the Companies by those who had earlier redeemed their shares at the 1998 redemption price established by the first Shields appraisal? Until the last Murphy-Blake Trust shares were redeemed, the value of the Trust depended, at least in part, on the continued financial health of the Companies, so the Trust would have suffered financially if the Companies had suffered financially from the legal fees and diverted focus arising from prolonged litigation with other family members, especially Uncle Dick and the “New York” side of the family.
4.Would the failure to redeem constitute a breach of fiduciary duly, since it would have left the Trust’s investments wholly undiversified, resting entirely on the financial success of the Companies?
Considering these factors, this Court finds that the redemption of 125 shares of Diehl & Son on October 13, 1999 at the 1998 redemption price of $285 per share was fair to the Trust beneficiaries. The Trust had incurred substantial legal fees arising from the split of the Trust between the Richard Murphy side of the family and the John Murphy side, and the Trust had far too little cash to pay these legal bills. There is no indication that anyone wanted the Trust to borrow to pay these bills. A small redemption of stock was reasonable and fair. Since the closing on the redemption of Uncle Dick’s shares had occurred that same day, at a price determined by the independent Shields valuation, approved by the Companies’ Board, it was fair to use that same sales price for this redemption. The alternative would have been to demand a new appraisal, which would have delayed payment to the law firms by roughly nine months, cost the Trust roughly $7,500, and provoked anger from the New York side of the family, which had just redeemed at that price.
This Court also finds that the subsequent smaller redemptions made at the 1998 redemption price between February 2, 2000 and July 5, 2000, paid for from cash flow, that were intended to diversify the Murphy-Blake Trust and invest the proceeds in the stock market, were also fair to the Trust beneficiaries. These redemptions, which involved all of the Trust’s holdings in Diehls, Inc.’s shares and roughly 10.5 percent of the Trust’s holdings in Diehl & Son, yielded $281,463, which was invested profitably in the stock market during the waning days of the “boom” market. The largest single redemption was on February 3, 2000, less than five months after the closing on Uncle Dick’s redemption, of the 159 shares in Diehls, Inc., which netted $100,488. While there was certainly reason to believe that the 1998 redemption price no longer reflected the share price that would be obtained from a new appraisal, awaiting the completion of such an appraisal would have significantly postponed the commencement of any diversification in the Trust (which risked a claim of breach of fiduciary duty for failure to diversify), and ordering a new appraisal this soon after Uncle Dick’s closing would have posed a significant risk of litigation or family acrimony. The remaining redemptions of Diehl & Son stock through July 5, 2000 were small in quantity, never exceeding 200 shares, and never yielding more than $57,000. Given their size, it was reasonable for Sarah to conclude that they did not necessitate the expense, time, and delay of a new appraisal.
*582 This Court finds, however, that Sarah has not met her burden of proving that the final redemption of all the Murphy-Blake Trust’s holdings in Diehl & Son stock on September 22, 2000 — selling 5,402 shares at the 1998 redemption price of $285 per share for a total of $1,539,570 — was fair to the Trust beneficiaries. There are at least five reasons why this Court finds this final redemption unfair even though it found the earlier redemptions to be fair.
First, by September 22, 2000, there was strong reason to believe that a new appraisal would result in a substantial increase in the price per share, and that this increase would be worth waiting for, especially since some diversification had already occurred. There were at least three reasons for the likely increase in fair market value per share:
1. Property values in Wellesley were sharply increasing, and there was no reason to believe that the Companies’ properties would be exempt from such increases;
2. The Companies had just sold its oil business, which generated a substantial quantity of cash and shed a business that was posing an increasing burden to the Companies. Sarah testified that the Companies’ oil business was in decline, that its client base was declining, and that it needed either to be smaller or larger to be cost-effective. She also testified that it carried high overhead, high insurance premiums, and exposed the Companies to significant, potentially catastrophic environmental risks because of the ever-present danger of oil spills. She also stated that the oil business hired Teamster Union employees, who demanded high wages that squeezed profits. For all these reasons, Sarah certainly had reason to believe that the Companies may be worth considerably more without the oil business than it was worth with it.
3. In 1996, when the Shields valuation was performed, Uncle Dick’s family, Peter, Joan, Susan, and Ann all held shares in Diehl & Son. All redeemed at the 1998 redemption price which, in accordance with the by-laws, included a 20 percent discount for the sale of a minority interest and a further 35 percent discount reflecting the lack of marketability of shares in a closely-held corporation. In view of these discounts alone, even without any change in the total fair market value of the Companies, the redemption of shares substantially would increase the value of the remaining shares, because the redemption price was roughly only 52 percent of the fair market value per share.[15]
Second, the sale of the oil business and the passage of time significantly changed the family harmony equation, and the consequent risk of litigation, if Sarah had demanded a new appraisal before making this final redemption. The old appraisal became plainly obsolete after the sale of the oil business, so demanding a new appraisal was unlikely to provoke an outcry from anyone who had earlier redeemed at the 1998 redemption price. Moreover, the 1996 Shields appraisal, although it stated that its valuation of Diehl & Son was as of September 30, 1996, had relied on financial statements for the year ending September 30, 1995, and appraisals older than that, according to Joyce, could not even be used for tax purposes. Therefore, for tax reasons alone, an appraisal needed to be done every five years and this would have required an appraisal for the year ending September 30, 2000, which indeed was the appraisal that was ultimately prepared by Shields in 2001. Indeed, this Court finds that Sarah and Beth knew that they were going to need a new appraisal before the September 22, 2000 final redemption, as evidenced by the September 28, 2000 letter from Sarah to her siblings telling them of the need to discuss such an appraisal, and chose to execute the final redemption before September 30, 2000 because they thought, mistakenly, that redeeming within five years provided them with a kind of “safe harbor” with respect to their fiduciaiy duties. They could have (and should have) postponed the final redemption until they received the valuation from the new appraisal.
Third, the size of the final redemption meant that, even if the Trust was obligated under the by-laws to split the cost of the new appraisal, that expense would be a very small share of the amount of the redemption and would be more than overcome by the anticipated increase in the price per share.
Fourth, any delay in executing the final redemption by waiting for a new appraisal would be both less long and less problematic than delays as to the earlier redemptions. Since Sarah would have anticipated the receipt of substantial monies from the sale of the oil business months before the actual closing on that sale on August 31, 2000, she could have put the appraisal in motion well before the closing so that the new valuation price would become available shortly thereafter and the redemptions could quickly follow. Whatever delay would be required to await the new valuation would be less problematic since the Trust had already partially diversified its portfolio and the risk of holding the Companies’ stock had diminished with the sale of the oil business, which reduced the risk of a catastrophic loss arising from a major oil spill.
Fifth, this Court has no doubt that, if Beth or Sarah had sat down with Joyce before September 22, 2000, explained the circumstances, and asked him whether they should proceed with the final redemption at the 1998 redemption price or await the results of a new appraisal, he would have strongly advised them to await the results of a new appraisal. With this advice, Sarah could have avoided the risk of any family acrimony simply by informing them of Joyce’s advice or inviting them to speak with him themselves. Instead, Beth specifically chose not to ask for this advice, anticipating that he would tell her advice she did not *583 want to follow, and decided to proceed based on an earlier comment that Joyce had made in a context wholly different from a redemption.
Therefore, this Court finds that Sarah breached her fiduciary duty as Trustee by approving the final redemption of Diehl & Son shares on September 22, 2000 when she had a conflict of interest as to this redemption and, without the specific, informed approval of either the co-trustee or the Trust beneficiaries, authorized a redemption that was not fair to the Trust beneficiaries. She is liable to the Trust for this breach.
Beth’s Liability to the Trust
Having found Sarah liable to the Trust for her breach of fiduciary duty as a Trustee in authorizing the final redemption, this Court must determine whether Beth is also liable for her conduct, even though she was not a named Trustee of the Trust. To be sure, if Beth’s sole role in the final redemption was simply to execute Sarah’s instructions, this Court would not find her liable for Sarah’s breach of fiduciary duty. But Beth’s role was plainly more than that. She was the only person speaking to the Trust attorneys, and the only person seeking and receiving their legal advice. She selectively informed Sarah about the legal advice she had sought and received, telling Sarah that Joyce had said that the Trusts could redeem with the 1998 redemption price since the appraisal was less than five years old. She was the person deciding when to redeem Trust shares and how many to redeem, since she, as Treasurer of the Companies, knew when cash flow was available to pay for these redemptions. Indeed, it is not clear from the record whether she even sought Sarah’s approval in advance for any redemption, except for the final redemption, for which she prepared a memorandum for Sarah’s (but not Peter’s) signature. For all practical purposes, Beth performed the role of a co-trustee of the Murphy-Blake Trust— receiving legal advice on behalf of the Trust, advising Sarah as to Trust matters, and even making decisions regarding redemptions on behalf of the Trust, telling Sarah later of the transactions she had performed on behalf of the Trust. Having accepted the role of co-trustee, it is only fair that Beth also assume the fiduciary obligations that come with that role.
The Supreme Judicial Court has declared that a person without a fiduciary duty to a trust beneficiary may be liable for participating in a fiduciary’s breach of duly when she “knew of the breach and actively participated in it such that he or she could not reasonably be held to have acted in good faith.” Spinner v. Nutt, 417 Mass. 549, 556 (1994). See also Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172 (1991) (non-employee may be liable if he knowingly participated with officer in his breach of the duly of loyally owed to employer). This Court finds that Beth knew of Sarah’s breach of her fiduciary duty and nonetheless actively participated in the breach. Therefore, she is liable to the same extent as Sarah for aiding and abetting Sarah’s breach of fiduciary duty.
The Measure of Damages
Peter, on behalf of the Trust, argues that the appropriate measure of damages for Sarah’s and Beth’s breach of fiduciary duty is to treat the final redemption as having been rescinded and determine the amount the Trust would have received had it held the Diehl & Son shares until the time of the merger in 2004. Sarah and Beth contend that the fairer measure is to determine what the redemption price would have been for the shares redeemed during the final redemption had a new appraisal been conducted and the shares valued as of September 30, 2000, just eight days after the actual final redemption. This Court finds that the latter is indeed the fairer measure, for at least two reasons.
First, the plaintiffs measure of damages would be fair if this Court were to find that the beneficiaries would not have approved a proposal to redeem all the Trust’s shares in Diehl & Son at the new appraisal price had that option been provided to them in September 2000. However, this Court finds that the beneficiaries would all have gladly approved that redemption, especially since there is no dispute that the new appraisal price (whatever it is precisely determined to be) would have been substantially greater than the $285 per share price at which Uncle Dick, Peter, Joan, and Susan had all redeemed their shares within the past two years. Indeed, Peter, Joan, and Susan chose to redeem all the shares they individually held at the lower price in 1998 and 1999.
Second, this Court has found that all the beneficiaries knew or should have known that substantial redemptions of Companies’ stock had been made by Sarah on behalf of the Murphy-Blake Trust no later than November 15, 2000, when the siblings met with Pam Czerkanski from Loomis to discuss the investment portfolio of the Murphy-Blake Trust and the Pfeiffer Trusts. At no time prior to the merger did they voice any opposition to the redemptions or inquire into their extent. From their silence, this Court infers that the beneficiaries were not committed to the Murphy-Blake Trust retaining any shares in the Companies, and appeared content with the diversification of its portfolio. They cannot justly now claim, after learning that the price per share obtained at the merger was far higher than they expected, that they had wanted to hold on to those shares, since they expressed no such sentiment before the merger. Certainly, this Court doubts they would have made this argument had the shares diminished in value at the time of the merger.
This Court recognizes that, with this measure of damages, the price per share that the Trust will receive from the final redemption will probably be substantially less than the price per share that Sarah and Beth obtained at the merger for their shares. This Court *584 sees no injustice in such an outcome, since Sarah and Beth bore the risk that the Companies’ shares would diminish in value from September 2000 until the merger in 2004 and the proceeds they obtained from the merger will effectively be reduced by the amount of this judgment.
ORDER
For the reasons detailed above, this Court ORDERS that:
1. This Court finds that Sarah breached the fiduciary duly she owed to the Murphy-Blake Trust when she made the final redemption of Diehl & Son shares held by the Trust on September 22, 2000. This Court also finds that Beth aided and abetted Sarah in that breach of fiduciary duty. Both are jointly and severally liable to the Trust for the damages arising from that breach of fiduciary duly.
2. This Court finds that Sarah and Beth did not breach the fiduciary duty they owed to the Murphy-Blake Trust in making the earlier redemptions.
3. The measure of damages arising from their breach of fiduciary duty is the difference between the redemption price that would have been paid for the shares redeemed during the final redemption had a new appraisal been conducted (with the shares valued as of September 30, 2000), and the actual redemption price.
4. The parties shall confer to determine if they can reach a stipulation as to what the actual amount of damages would be using this measure of damages. If they cannot agree upon a stipulation, a second phase of the trial shall be conducted to determine the actual amount of damages.

This claim also alleges a breach of fiduciary duty by Beth for having aided and abetted Sarah in her breach of fiduciary duty as Trustee of the Murphy-Blake Trust.

This Court expressly reserved the issue of the amount of damages (if damages were to be awarded) until the conclusion of a second phase of the trial, but, equally expressly, reserved the ability to determine the proper measure of damages based on the evidence at the first phase.

The preliminary analysis was used as the final analysis, since no further analysis was requested or provided.

It is not precisely clear from the record what caused the 1998 redemption price for Diehl & Son slightly to exceed the price set by the Shields valuation. Beth asked Shields to update the value of Diehls, Inc. in May 1997 to reflect that company’s net loss of $ 103,354 for the year ending December 31, 1996, which reduced the valuation from $653 per share to the redemption price of $632 per share. It is likely that she made a similar request with respect to Diehl & Son, which resulted in an increase in the price per share to the redemption price of $285.

Ann used the amount redeemed to purchase preferred shares in Diehl & Son with a nine percent annual rate of return.

Chester Augustin, a former employee who was not a member of the family, continued to hold a small quantity of shares.

This Court need not resolve the family dispute as to whether Sarah filled the void left by Peter or whether Peter let Sarah make all the decisions because he feared to incur her anger if he disagreed with her. Whatever the reason, the bottom line was that Sarah was left in charge of the Trust, and Peter let her do so without interference.

Beth made a record of her conversation with Joyce in a chronology she was contemporaneously preparing prior to Uncle Dick’s redemption. Her chronology reflects that this conversation took place on November 19, 1997. Beth provided the chronology to her siblings on February 19, 1997 in preparation for a family meeting on February 26, 1997, but it is not clear from the record whether she ever provided her siblings with the chronological notes she added after February 19, 1997.

At her deposition, Sarah said that they did not discuss whether to sell all the Trust’s Companies’ stock, and made no decision to sell all its shares.

Later, Susan and her now-husband decided not to enter into a pre-nuptial agreement.

This Court does not credit the testimony of Sarah and Beth that Beth had Peter’s approval to sign his name.

While all the Murphy-Blake Trust’s shares were redeemed, there was cash sufficient to redeem only 720 Diehl & Son shares and 295 Diehls, Inc. shares held by the Pfeiffer Trust. These shares were also redeemed at the 1998 redemption price. After these redemptions, the Pfeiffer Trust held no Diehls, Inc. shares and 1,008 Diehl & Son shares.

Beth and Sarah told Peter that it was Companies’ policy that, if one did not own stock, one could not remain as a director, and provided him with a written letter of resignation for him to sign. He did not know of any such policy, but he did not challenge its existence, and signed the letter of resignation. This Court does not credit the testimony of Sarah and Beth denying that they asked for his resignation, and claiming that they were surprised by it. The existence of a written letter of resignation, plainly prepared by Beth, suggests that the impetus for his resignation came from them.

In fact, as noted earlier, the Shields appraisal established the fair market value of each common share in Diehl & Son as of September 30, 1996, even though the appraisal was dated September 11, 1996 and relied on financial statements for the year ending September 30, 1995 and real estate appraisals determining fair market value as of July 15,1996,. It is not clear from the record why Shields believed it appropriate to establish a fair market value as of September 30, 1996 that was based on data that, as to the financial statements, was one year old.

In the 1996 Shields appraisal, the equity value of Diehl & Son before the discounts for minority interest and lack of marketability was $18,013,016. With 34,630 outstanding shares, the fair market value per share, before the discounts, was roughly $520 per share. With the two discounts, the equity value of Diehl & Son was reduced to $9,366,768, which reduced the redemption per share value to $270. If half the shares had been redeemed, reducing the number of outstanding shares to 17,315, and the equity value of Diehl & Son before the discounts for minority interest and lack of marketability had remained unchanged except for the reduction arising from the need to pay for those redemptions (reducing it by $4,675,050 [17,315 x $270] from $18,013,016 to $13,337,966), the fair market value per share, before the discounts, would have increased to roughly $770. If one were then to declare 52 percent of that fair market value per share to be the redemption price, the redemption price would have risen to more than $400, an increase of $130 per share or roughly 48 percent from the earlier $270 per share redemption price.